# IN THE COURT OF APPEALS OF TENNESSEE

## AT KNOXVILLE

| | | |
|---|---|---|
| MEDICAL EDUCATION ASSISTANCE | ) | C/A NO. 03A01-9908-CH-00289 |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff/Appellee | ) | Appeal As Of Right From The |
| | ) | WASHINGTON CO. CHANCERY |
| | ) | COURT |
| v. | ) | |

# FILED

**December 16, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| | ) | |
| STATE OF TENNESSEE, through the | ) | HON. THOMAS J. SEELEY, JR., |
| EAST TENNESSEE STATE | ) | JUDGE, By Interchange |
| UNIVERSITY QUILLEN COLLEGE | ) | |
| OF MEDICINE, | ) | |
| | ) | |
| Intervenor/Appellee, | ) | |
| v. | ) | |
| | ) | |
| ASHOK V. MEHTA, M.D. | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

**For the Appellant**      **For the Appellee**      **For the Intervenor**

**Ashok V. Mehta, M.D.:**      **Medical Education**      **State of Tennessee -**

     **Assistance Corp:**      **ETSU Quillen College**

     **of Medicine:**

Thomas C. Jessee      Jack Tallent, II      Edward J. Kelly

Johnson City, TN 37605      Knoxville, TN 37902      Johnson City, TN 37614

AFFIRMED as MODIFIED                                Swiney, J.

and REMANDED


# **O P I N I O N**


This is an appeal of the Trial Court's enforcement of a covenant not to compete against

Ashok V. Mehta, M.D. ("Dr. Mehta"), a pediatric cardiologist, in favor of Medical Education Assistance

Corporation ("MEAC"), and the State of Tennessee through East Tennessee State University Quillen College of Medicine ("ETSU"). The Trial Court enjoined Dr. Mehta from practicing medicine in a seven county area for five years, and awarded damages of $358,265 to MEAC.

On appeal, Dr. Mehta states the issues as follows:

1.  The Trial Court erred in finding that as a matter of public policy in Tennessee a covenant not to compete involving a medical speciality is enforceable by a non profit corporation.

2.  The Trial Court erred in finding that there were special circumstances which entitled MEAC and ETSU to protection by enforcement of the covenant.

3.  The Trial Court erred in finding that the covenant in question, if enforceable, was fair and reasonable under the circumstances as set forth in existing case law.

4.  The Trial Court erred in failing to find that there was not [sic] intentional/negligent misrepresentation relating to Mehta's inducement to sign the employment contract containing the covenant.

5.  The Trial Court erred in failing to find that MEAC and ETSU had waived their entitlement to enforcement of the covenant by their actions.

6.  The Trial Court erred in not finding that MEAC and ETSU breached its contract with Mehta for failure to provide adequate equipment, space, research funds, and facilities.

7.  The Trial Court erred in awarding damages and the computation of the same as well as erred in granting a five year enforceable covenant.

MEAC appeals the Trial Court's award of six months' severance pay to Dr. Mehta as provided under the employment contract.

For the reasons stated in this opinion, we modify the judgment so as to enforce the covenant not to compete for an additional two years starting thirty days from the date of the entry of judgment of this Court. We remand this case to the Trial Court for the determination of additional damages to be awarded to MEAC for the period from the entry of the Trial Court's judgment through the date of entry of this Court's judgment. In all other respects, we affirm the decision of the Trial Court.

## BACKGROUND

The East Tennessee State University Quillen College of Medicine was established pursuant to the Teague-Cranston Act. One of its goals, in addition to training physicians generally, was

to encourage physicians to enter into practice in rural areas of Tennessee. ETSU has the ability to pay its faculty physicians only a state-furnished base salary, an amount much lower than the salaries generally earned by similar physicians in private practice. ETSU depends upon the Medical Educational Assistance Corporation (MEAC) to supplement that base salary in order to attract highly qualified faculty members. MEAC is a non-profit, professional corporation affiliated with ETSU for the purposes of allowing physician faculty members to conduct a clinical practice in addition to their faculty duties, and providing a means by which students in the College of Medicine and resident physicians can have valuable hands-on integral experience. Such an arrangement is known as a "faculty practice plan."

The State of Tennessee funds approximately $19 million per year of the ETSU College of Medicine budget. MEAC supplements this by providing 31% of the total College of Medicine annual budget from the income brought in by faculty physician clinical practices. Nationally, medical school budgets are supplemented an average of 41% from similar practice group funds.

In 1986, Dr. Mehta accepted a pediatric cardiology faculty position at ETSU, after reading a vacancy announcement in a professional journal. The previous pediatric cardiology professor at ETSU had died, and Dr. Mehta was hired to take over her responsibilities and to expand the program by adding his expertise in electrophysiology and pediatric cardiology interventional techniques.

In 1983 or 1984, there had been a major physician-faculty loss at ETSU when the entire cardiac surgical team withdrew from the College of Medicine and MEAC and set up a competing medical practice in Kingsport. This caused various administrators at ETSU and MEAC to become concerned about the potential effect of such departures on medical school accreditation. Some faculty and administrators perceived that the college was being used as a tool whereby a young surgeon, internist or pediatrician completing the residency program would find it attractive to join the faculty, receive a basic guaranteed salary support, build up a practice over two or three years, and then leave to go into the private sector, having built up a private practice at the State's expense.

In a move to reduce or eliminate such defections, the Board of Directors of MEAC, at its June 5, 1986 meeting, adopted a resolution requiring faculty hired after that date to sign a covenant not to

compete. The covenant was deemed to be crucial to ETSU because of the location of the medical school in a rural area. In such an environment, there is a finite number of patients available for teaching activities, especially in subspecialty areas such as pediatric cardiology, and ETSU needed to keep its patient base for these teaching purposes. Appendix A of this Opinion is a copy of the covenant not to compete from Dr. Mehta's contract.

Although the covenant not to compete was to be included in the employment contracts of physician faculty members after July 1, 1986, it did not apply to physicians hired before that date. Moreover, some later-hired faculty were not required to sign the covenant, some were allowed to sign modified covenants, and some who signed the covenant were later released from it by vote and approval of the MEAC Board, based on individual circumstances. For example, physicians who joined MEAC after having already established a private practice were not required to sign the covenant. Psychiatrists and family practitioners were exempt. Physicians who had family ties to the area sometimes had a modified version wherein, if they taught and practiced at ETSU for five years, they were not restrained from competing against MEAC, so long as they agreed to teach at ETSU for another five years after establishing a non-MEAC private practice. MEAC board minutes indicate that a Dr. Evans and a Dr. Thacker were apparently released from the covenant because their attorneys or the MEAC attorney advised the board of concerns about the enforceability of the covenant.

Dr. Mehta entered into his employment contract with MEAC in November 1986. He testified that he did not want to sign the covenant not to compete, and signed it only after being told that all physicians were required to sign it as a condition of employment. In this contract, Dr. Mehta specifically agreed that ETSU, Quillen College of Medicine, was a third party beneficiary of this covenant not to compete and entitled to enforce its provisions.

Dr. Mehta was hired to work in Kingsport, and he quickly established a successful pediatric cardiology practice there and developed a large referral base of pediatricians, some of whom were new referral sources for ETSU. His new expertise also brought referrals of types of patients ETSU had not treated before.

Dr. Festus A. Adebonojo was hired as Chairman of Pediatrics in December 1988 and became Dr. Mehta's supervisor. When Dr. Adebonojo was hired, the President of ETSU gave him the clear understanding that a main facet of his job, in addition to ensuring the Pediatrics Department "was solid," was the establishment of a Pediatric Residency Program. Dr. Adebonojo was told that without such a program, the accreditation of the medical school "was in jeopardy," since accredited medical schools must have accredited residency programs in all clinical departments, including surgery, medicine, obstetrics/gynecology, pediatrics and others. Also, a Pediatric Residency Program must have six of ten possible pediatric subspecialties. This program chose pediatric cardiology as one of its six required subspecialties.

Dr. Adebonojo studied the history of the Pediatrics Department at ETSU and learned that its proposals for an accredited Pediatric Residency Program had been denied twice, in part because the program, as envisioned, was to be based "all over the place," i.e., in Johnson City, Kingsport and Bristol. He decided that the program would be more likely to obtain accreditation if he consolidated it to one location. He asked the hospital administrators of the hospitals in Bristol, Johnson City and Kingsport to commit to helping ETSU build a Children's Hospital and told them that whichever hospital committed to the project would receive the benefit of having the Pediatric Residency Program at their hospital. He testified that Bristol Memorial Hospital did not respond. Kingsport's Holston Valley Hospital administrators met with him six times, but negotiations broke down. The hospital in Johnson City ultimately agreed to support a Children's Hospital and in 1992, Dr. Adebonojo moved all pediatric faculty offices and services to Johnson City.

Dr. Mehta did not want to move from Kingsport to Johnson City and objected to doing so. When the decision was made, he had been in Kingsport for five years and had established a good practice there. His office space in Kingsport was adequate and his family was settled there. He met with Dr. Adebonojo and made requests and proposals to stay in Kingsport, to no avail.

Against his wishes, Dr. Mehta moved his office, his practice and his family to Johnson City in 1992. Because Dr. Mehta objected strongly to moving into smaller professional office space in

Building 325, where other pediatric faculty were assigned, Dr. Adebonojo rented space in Building 310 for Dr. Mehta and Dr. Rajani Anand, another pediatric cardiologist who had been hired after Dr. Mehta. That space included four exam rooms, one of which they shared with another doctor, plus three other rooms Dr. Mehta could use to see patients if necessary, including a treadmill room, his personal office, and a conference room. There was also a dictation room and a research room in Building 310.

1992 was a bad year for Dr. Mehta's relationship with the medical school for another reason. MEAC changed the way his income was determined and directed that he and Dr. Anand, whom Dr. Mehta had wanted to hire, would split the MEAC Pediatric Cardiology income 50-50. As a result of these changes, his income, as a percentage of the revenue he brought in to MEAC, began to decline and continued to do so every year thereafter until he finally left. Dr. Mehta testified that as of 1997, "it was almost 40 - 45 percent less than what [I] had in 1992."

The rent on the space in Building 310 was $67,000 per year. Over time, as the conditions of practice for the Pediatrics Department became more financially challenging due to changes in TennCare, that rent became burdensome in terms of the overall budget of the department. In 1996, Dr. Adebonojo decided to move all of the faculty into Building 325. Dr. Mehta strongly objected. The initial plan for the move to Building 325 called for Dr. Mehta to be assigned two examining rooms with Dr. Anand, plus an echo room and a consultation room, both to be shared with other Pediatric Department faculty. His personal office was to be located in another building. The medical charts would not be located in the same building as his personal office. He testified that he takes many emergency calls, and the plan would have required him to take such calls, get in his car and drive to the other building, look at the chart, then return the call. He said that "[i]n good conscience, I could not do that."

Dr. Mehta had several meetings with supervisors and administrators, trying to avoid moving to Building 310. In October, 1996, he met with Dr. Shepard, then with Dr. Shepard and Dr. Adebonojo. In January, 1997, he discussed the problem in the Pediatric Department monthly meeting. In February a special meeting was called by Dr. Adebonojo with Drs. Mehta, Anand, Shepard and one other person present. Dr. Mehta was told unequivocally that he would receive no more than two exam

rooms in Building 325. There were plans to eventually remodel the space to transform the total of 11 exam rooms to 18 smaller ones, to be shared by all pediatric faculty, but Dr. Mehta thought the rooms then available for his use would still be inadequate, both in number and size. Dr. Mehta complained that he and Dr. Anand were seeing eight to ten patients for each half day clinic, but with the immediate change, they would only be able to see four or five patients. There were four pediatric residents and four cardiology fellows, each taking electives for four weeks, plus third year medical students rotating. The rooms would have to be large enough to accommodate this. His expressions of concern were unavailing.

On February 7, 1997, Dr. Mehta met with Drs. Rary, Michael, and Anand and asked Dr. Adebonojo to meet with them again to discuss the move and other options. Dr. Adebonojo did not accommodate this request. At the monthly Pediatric Department meeting on February 11th, Dr. Mehta again expressed concerns about the move. On February 14th, he received the written clinic schedule, indicating that he and Dr. Anand were, indeed, assigned only two exam rooms to share.

While Dr. Mehta was contemplating leaving ETSU, his attorney called Dr. Stanton, vascular surgeon and President of ETSU and MEAC, on one or two occasions and indicated that he was counseling Dr. Mehta about that decision. He also indicated he was counseling two other individuals, one of whom was "another very significant cardiologist in MEAC's adult group." Dr. Stanton testified that he was particularly troubled as to the subspecialty groups if practitioners were to leave. For example, he believed that if MEAC lost their current heart surgery team, which they had replaced six years after the earlier team left, "it could put us [the College of Medicine] under."

On March 3, 1997, Dr. Mehta submitted his resignation letter to Dr. Adebonojo, effective May 1, 1997, giving as his reasons the limited space and the reduction in his personal income occasioned by the lack of facilities to see as many patients as he had been seeing. ("I am greatly concerned about my financial, physical, and mental health in this worrisome long-term situation.") In response, Dr. Adebonojo advised him twice that if he left his faculty position, ETSU and MEAC intended to enforce the covenant not to compete.

Dr. Mehta invited Dr. Anand to leave MEAC and join him in private practice, which she

declined.  Dr. Anand stated that Dr. Mehta does electrophysiology studies and balloon procedures in older children that she does not do.  However, Dr. Mehta earlier had taken a six month sabbatical doing MEAC-sponsored training at Vanderbilt University, and during that period of time, no patients needed such treatment.  Further, the number of patients who need those particular studies is "very insignificant" in terms of the overall number of pediatric cardiology patients she and Dr. Mehta saw.

Dr. Mehta leased office space and began renovations to set up private practice in Johnson City.  In March, while still at ETSU, he began giving each of his patients a medical release authorization so that he could request their records for his new office when he moved.  He was directed to stop this practice and complied with that request.  During a brief period of Dr. Mehta's absence from campus, Dr. Adebonojo sent out a letter on March 17, 1997, to all referring doctors informing them that Dr. Mehta had announced his intention to resign and that they should continue to send their patients to the medical school after he left.  When Dr. Mehta returned, he began receiving phone calls from pediatricians "asking what was going on," and therefore he sent out postcards informing his referral sources and patients of his new address after May 1st.  He testified that it was medically necessary for him to notify his patients, since they had to know where to go for their next appointments. On April 22, 1997, Dr. Adebonojo sent letters to parents of all of Dr. Mehta's patients, advising them that MEAC remained capable of providing "a comprehensive array of care for your child," and that it "is therefore, not necessary for you to transfer your child's cardiology care needs outside of the University."

Dr. Mehta left ETSU and MEAC as planned and set up his private practice in May 1997, and immediately began seeing patients from his MEAC practice as well as new referrals.  His private practice office in Johnson City has five examination rooms.  After 18 months, he had billed $2,219,446.06, had collected $968,945.91, and had acquired 1,510 private patients, of whom 345 were patients formerly seen in his MEAC practice.  He had records on another 110 former MEAC patients whom he had not seen yet.  He testified that if he is forced to leave East Tennessee, the communities will be adversely affected because he is the only pediatric cardiologist in the area who has expertise in angioplasty, valvuloplasty and electrophysiology.  There are probably only 100 such

specialists in the United States, and he believes that if he leaves, all these patients will have to go to Duke University or Vanderbilt University for treatment.

In July 1997, MEAC and ETSU hired Dr. Thomas Chin, a board-certified pediatric cardiologist, to replace Dr. Mehta. Dr. Chin devoted half of his time during the early months of his tenure to marketing the pediatric cardiology division in an effort to rebuild the practice and obtain referrals from the physicians who had referred patients to Dr. Mehta. His efforts were mostly unsuccessful, owing to Dr. Mehta's good reputation among local pediatricians and their desire to continue to send their patients to him. The number of patients seen at ETSU's pediatric cardiology division significantly declined, the number of clinics held declined, and the medical students' and residents' access to patients declined during this time. For example, from August 1997 through September 1998, the pediatric cardiology division had a 62% decline in new patients and a 46% decline in physician referrals, as compared to the most recent one-year period of Dr. Mehta's employment. Referrals from non-MEAC doctors declined over 70%.

Meanwhile, Dr. Mehta maintained his private practice in Johnson City and opened satellite offices in Bristol, Kingsport and Morristown. Since Hamblen County is not among the seven counties listed in the covenant, the Morristown office is the only location not covered by the covenant.

## TRIAL COURT PROCEEDINGS

On June 11, 1997, MEAC filed its Complaint for Declaratory Judgment and Injunctive Relief in this case, asking the Chancery Court to enforce the covenant not to compete. MEAC asked for a temporary injunction against Dr. Mehta and, upon hearing, for a permanent injunction against his practicing medicine in the seven covenant counties and for money damages.

Dr. Mehta answered on July 10, 1997, that "the alleged covenant not to compete is void " for lack of consideration and as against the public policy of the State of Tennessee, "because the plaintiff is attempting the corporate practice of medicine which is illegal in the State of Tennessee." By way of counterclaim, he averred that MEAC had breached its employment contract by failing to provide, pursuant to paragraph 20 of the original contract, office space, equipment and support necessary to

properly maintain a practice of pediatric cardiology. Dr. Mehta also averred that MEAC had breached its contract by selectively enforcing the covenant against some physicians but not others, by its accounting of receipts for his services, and by failing to pay the severance package MEAC owed to him.

A hearing on MEAC's request for temporary injunction was held on July 28, 1997. Based on the testimony and exhibits at that hearing, the Trial Court entered an order on October 17, 1997 in which the Court found that MEAC benefits the faculty of ETSU by serving as a vehicle to allow them to engage to some extent in private practice and thereby supplement their faculty salaries. It also benefits the University by allowing it to attract physicians and by providing a patient base for training future physicians. The Court found that continuing accreditation of the residency program in pediatrics requires a sufficient patient base so that students in medical school can have the appropriate clinical training, for teaching purposes, for treating purposes, and for generating income.

Applying familiar requirements for the granting of an injunction, the Court found that there was no question that Dr. Mehta's leaving had caused harm to ETSU and MEAC, due to the loss of patients and income, which could adversely affect accreditation. The Court found the harm was immediate, and that the potential for that harm to continue was substantial. However, the Trial Court did not find the harm to be irreparable. Rather, the Trial Court found:

> It would be violative of the public interest to deprive this area of [Dr. Mehta's] expertise . . . Dr. Mehta has served the University well over this almost eleven-year period. Whatever investment the University had in him, he has repaid several times over during his tenure.

Accordingly, the Trial Court declined to grant MEAC's request for a temporary injunction.[1]

On November 25, 1998, the Trial Court entered a Consent Order Granting Motion to Intervene in which the James H. Quillen College of Medicine, East Tennessee State University, State of Tennessee was designated an intervening party in order to protect its rights.

The case was tried on March 15 - 18, 1999, and the Trial Court filed its Opinion on June 14, 1999. The Court, in a detailed and comprehensive Memorandum Opinion, summarized the facts which influenced the Court's decision. The Court noted, specifically, a Damage Estimate Report

prepared for trial by Pershing Yoakley & Associates, trial exhibit 32, which included the following data:

> In the United States there are approximately 800 pediatric cardiologists, which equates to one specialist for every 97,100 children. The population base in the Tri-Cities area of 112,778 children supports 1.15 full-time equivalent pediatric cardiologists. The Tri-Cities now has approximately 2.3 full-time equivalent pediatric cardiologists: Drs. Mehta, Chin and Anand. The market from which the pediatric cardiology division draws patients does not have the capacity to generate the visits required to economically support both Mehta's practice and the pediatric cardiology division of MEAC.

Based on testimony and evidence at trial, the Court found that:

> Requiring Mehta to leave would have resulted in the loss of his ability to perform approximately five procedures which could not be done by Drs. Anand or Chin in 1998. The loss to the community of these relatively few procedures as a result of Mehta's having to leave the area would be greatly overshadowed by the loss to the community which would result from the far-reaching harm caused the College as a whole if Mehta is allowed to stay in the area and continue to retain the referral base. Drs. Anand and Chin would be able to substantially provide for all pediatric cardiology patients if Mehta relocates outside the covenant area, just as Anand handled the entire patient load when Mehta went on a six-month sabbatical to Vanderbilt Hospital.

Again applying *Hasty v. Rent-A-Driver, Inc.,* 671 S.W.2d 471 (Tenn. 1984), the Trial Court found:

> Setting legal niceties and arguable factual issues aside, this case really turns on what is in the public interest, i.e., is it in the public interest to have Mehta remain here with the great majority of the patient referral base, or is it in the public interest that MEAC and its pediatric cardiologists have the patient referral base for the use of the students at the College of Medicine as well as serving the area's public.

The Trial Court set out a list of considerations in favor of and against enforcement of the covenant. Finally, the Trial Court found this particular covenant not to compete to be enforceable, based on substantial and irreparable damage to MEAC and ETSU so long as Dr. Mehta remains and competes with his former employer. Accordingly, by Order of June 14, 1999, the Trial Court enjoined Dr. Mehta from engaging in the practice of medicine in the restricted area for a period of five years, "commencing this day." The Court also awarded monetary damages to MEAC in the sum of $358,265 and dismissed

all other claims. On subsequent Motion to Alter or Amend, the Trial Court ordered that the damage award should be reduced by $21,050.50, the amount MEAC owed Dr. Mehta for six months severance pay as provided in paragraph 15 of the employment contract. On July 29, 1999, the Trial Court ordered that, upon the posting of a cash bond by Dr. Mehta, its five-year injunction against his practice in the seven-county area be stayed pending his appeal. Dr. Mehta posted the bond and the injunction was stayed pending this appeal.

## DISCUSSION

Our review is *de novo* upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Davis v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). A Trial Court 's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293 (Tenn. 1997).

Dr. Mehta first raises the issue that the Trial Court erred in finding that, as a matter of public policy in Tennessee, a covenant not to compete involving a medical specialty is enforceable by a non-profit corporation. His second and third issues are inextricable from the first. In his second issue, Dr. Mehta contends that the Trial Court erred in finding that there were special circumstances which entitled MEAC and ETSU to protection by enforcement of the covenant. In the third issue, he contends that the Trial Court erred in finding that the covenant, if enforceable, was fair and reasonable under the circumstances as set forth in existing case law. We will discuss these first three issues together.

Dr. Mehta argues that, when he entered into this contract, T.C.A § § 63-6-204 and 68-11-205 provided that a corporation and any state, local, county governmental unit or division thereof were prohibited from the practice of medicine and physicians were not permitted to divide or split fees with non-physicians. Despite the later-enacted amendment of T.C.A § 63-6-204 to allow for faculty practice plans, Dr. Mehta says the law at the time the contract was entered into governs, and under that law and the particular circumstances of this case, this covenant should not be enforced as a matter of public policy.

We first observe that Dr. Mehta's argument is directed against MEAC, not ETSU. However, paragraph 22 of the contract, the covenant not to compete, specifically provides that ETSU is a third-party beneficiary of the contract and is entitled to enforce its provisions. Even if Dr. Mehta's argument against MEAC were to prevail, ETSU could still enforce the covenant as a third-party beneficiary.

The weakness in Dr. Mehta's public policy argument against the involvement of MEAC in the doctor-patient relationship is its timing. The covenant was entered into in 1986. Dr. Mehta first raised this "corporate practice of medicine" argument more than ten years later. Dr. Mehta is estopped from raising the issue now. Our Supreme Court has held:

> Equitable estoppel, in the modern sense, arises from the 'conduct' of the party . . . his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which *might* have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

*Baliles v. Cities Serv. Co.,* 578 S.W.2d 621, 624 (Tenn. 1979) (citations omitted).

In this case, Dr. Mehta's positive acts in practicing medicine as an employee of MEAC and his silence or negative omission to make any objection inured to his great benefit. MEAC provided, among other benefits, an initial referral network and office space, equipment and staff for more than a decade. Accordingly, we find he is estopped from now complaining that the contract involves the corporate practice of medicine.

Even without the ten-year lapse before Dr. Mehta raised the corporate practice of medicine issue, his argument on this issue would fail. The corporate practice of medicine is enjoined in Tennessee by T.C.A § 68-11-205. In order to practice medicine in Tennessee, one must be licensed by the Board of Medical Examiners, as provided in T.C.A § § 63-6-201, 202. The reason for this requirement is so that the Board can "examine the qualifications of all applicants for certification of fitness to practice medicine or surgery in this state. . . ." The rule exists for the benefit of the citizens of this State, who depend upon the Board to ensure that the practice of medicine is conducted only by qualified

individuals. There is no evidence in the record that MEAC has or will subject the citizens of Tennessee to such unauthorized medical practice. Accordingly, we further decline to apply the corporate practice of medicine rule in this instance in favor of Dr. Mehta, who is not a member of the class of citizens to be protected by the statute and who seeks enforcement of the rule for other, more personal reasons.

Dr. Mehta next argues, as to the public policy involved in the enforceability of this covenant:

> as a matter of public policy, this particular covenant should be unenforceable because MEAC/ETSU cannot establish that it is necessary to protect any legitimate interests. If the Court is not willing to take the additional step of stating that all covenants involving practicing physicians are against public policy because they interfere with the doctor/patient relationship, then certainly this type of covenant is far broader and more onerous than ones recognized in other jurisdictions as enforceable.

In adopting T.C.A § 63-6-204(e) in 1997, our legislature implemented the public policy that covenants not to compete are enforceable against physicians employed by faculty practice plans such as MEAC, with some limitations. The Act provides, in part:

> The general assembly further finds that restrictive covenants and prohibitions against an employed physician's right to practice medicine upon the termination or conclusion of the employment relationship with a faculty practice plan are reasonable and not inimical to the public interest, subject to the temporal and geographic limitations set forth in subdivision (2).

Those limitations provide that, in some cases, such covenants must be restricted to one county and continue for no longer than two years. However, this case arises from a covenant entered into prior to the enactment of T.C.A § 63-6-204(e). Dr. Mehta says the later-enacted statute cannot be retrospectively applied to uphold his covenant on public policy grounds. He is correct. However, MEAC argues that the enactment was not a substantive change in the law but merely a clarification by the legislature of pre-existing law. Indeed there is support for MEAC's position in the legislative history.[2] Accordingly, to resolve Dr. Mehta's first three issues, we must determine whether this particular 1986 covenant is enforceable in Tennessee as a matter of public policy, considering any special circumstances as well as whether it was fair and reasonable, without being bound by the provisions of the later-enacted statute.

Dr. Mehta, ETSU and the Trial Court agree that there are no cases in Tennessee dealing with covenants not to compete against physicians, and that the leading Tennessee case on such covenants generally is *Hasty v. Rent-A-Driver, Inc.,* 671 S.W.2d 471 (Tenn. 1984). In that case, Rent-A-Driver, Inc. was in the business of leasing services of truck drivers to other businesses. Earl Hasty entered into an employment contract as a driver for the company. The contract contained a covenant not to compete against Rent-A-Driver in which Hasty agreed:

> that for a period of six months from the date employee is last assigned for work by Rent-A-Driver, Inc. that employee will refrain from accepting or soliciting any employment of the type performed by Rent-A-Driver Inc. from any account to which employee has been assigned . . . within a one hundred miles radius from the offices of Rent-A-Driver, Inc. . . .

Our Supreme Court held that non-competition covenants in employment contracts are not favored in Tennessee because they are in restraint of trade. However, they are not invalid per se and will be enforced, provided they are reasonable under the particular circumstances. The Court set out factors relevant in determining reasonableness: (1) the consideration supporting the agreements; (2) the threatened danger to the employer in the absence of such an agreement; (3) the economic hardship imposed on the employee by such a covenant; and (4) whether or not such a covenant should be inimical to public interest. An employer cannot restrain ordinary competition. In order for an employer to be entitled to protection under a non-competition covenant of an employment contract, there must be special facts present over and above ordinary competition such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer. Certain legitimate business interests have emerged as being entitled to the protection of a non-competition covenant, including the preservation of trade or business secrets and confidential information. In other cases, covenants have been upheld when the employee has associated closely or had repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee (i.e., the employee becomes "the face" of the employer to its customers). General knowledge and skill obtained by the employee, even if acquired with expensive training, is not a protectable interest of the employer, but training in conjunction with other factors has been cited as a factor in upholding the

reasonableness of a covenant. *Id.* at 472, 473.

The Supreme Court, in *Hasty,* found that the driver did not have trade or business secrets or confidential information, did not personally influence customers' decisions regarding use of the employer's services, and did not receive training from the employer. There were no facts of the type ordinarily used to attempt to justify a non-competition clause. The Court found that the basis of the employer's suit was the loss of its employees to a competitor, and that "this is the type of injury which results from ordinary competition and which cannot be restrained by contract." Accordingly, the Court found the non-competition clause against Hasty to be unenforceable.

In the case before us, the Trial Court, in a well-reasoned and comprehensive analysis, applied the principles set out in *Hasty* and considered medicine-related cases in other jurisdictions.[3] The Trial Court then concluded, as quoted from the Trial Court's detailed Memorandum Opinion:

1. Covenants not to compete contained in an employment contract, although not favored in the law, are valid and enforceable if reasonable.

2. The reasonableness of such restrictive covenants is a matter of law for the court.

3. A covenant not to compete may be reasonable as to one employee and unreasonable as to another. Each case is limited to its own particular facts. However, the resolution of the validity of this covenant under these circumstances is important beyond Dr. Mehta alone. Other physicians, both those employed by MEAC and physicians in private practice, and the College of Medicine are vitally interested in and concerned with the outcome of this case.

4. In determining the reasonableness of a covenant not to compete involving a physician, in addition to the factors of time and geographical limitations, the court must consider the "special facts" of each situation, the most important of which is the public good.

5. The covenant not to compete in this instance is reasonable on its face (no competition for five years in a seven-county area).

6. To determine if there are "special facts" which render this covenant enforceable as to Dr. Mehta, the court must balance the competing interests of the College of Medicine and its clinical arm, MEAC, and the interests of Dr. Mehta and the public.

   A. Competing Interests:

1. The College's interest in recruiting and retaining skilled faculty members for its teaching and research goals.

2. The College's interest in providing quality medical care, especially in the areas of specialization and subspecialization.

3. The College's interest in giving its medical students and residents adequate clinical experience which can only come through having a sufficient patient base.

4. Dr. Mehta's interest in the likelihood of a greater income and more personal freedom in private practice.

5. Dr. Mehta's interest in remaining in the community where he has now developed significant ties.

6. The public's interest in having access to a highly skilled professional such as Dr. Mehta.

7. The public's interest in having the College of Medicine and its faculty practice plan not only remain viable, but continue to grow in both prestige and its contribution to the community.

B. Factors bearing on "considerations":

Dr. Mehta entered into the contract with the College and MEAC knowingly and at no bargaining disadvantage. He did not have to take this employment opportunity; with his qualifications he would have had many opportunities available to him, just as he now has. Dr. Mehta was the beneficiary of and further developed the patient referral network with area physicians. Immediately upon his departure from MEAC and the College, Mehta opened his private practice in competition with University Physicians on the following day. He has taken the acquired referral network with him. The College has replaced Mehta with Dr. Thomas Chin, also a board-certified pediatric cardiologist. However, the area physicians are continuing to refer their child patients with heart problems to the same physician they have for many years, Dr. Mehta. The College and MEAC are not able to replace those patients in this limited market. The Department of Pediatrics, and hence the College of Medicine, have sustained a significant loss, both of income, which affects equipment, supplies, space, and recruitment of new physicians, and the clinical opportunities for students and residents. This loss is irreparable so long as Dr. Mehta remains and competes with his former employer.

> There should be some sanctity to a contract. A contract is a set of promises. Dr. Mehta committed himself to not entering into competition with University Physicians (MEAC) in this area. He has breached his commitment. His breach has caused and will continue to cause substantial and irreparable damage, monetarily and educationally, to University Physicians and the College of Medicine.

The Trial Court found the covenant not to compete enforceable as to Dr. Mehta and permanently enjoined him from engaging in the practice of medicine in the restricted area for a period of five years, "commencing this day."

This case involves competing public interest considerations. The first such interest is the right of a patient to choose her physician and to be allowed to continue that relationship even after the physician leaves her place of employment. The competing public interest is the public's interest in having an accredited, qualified, and well staffed medical college in upper East Tennessee. It is in the public's interest for the medical college, ETSU, to have a sufficient patient base to allow it to train medical students, interns, and residents in the most effective and best way possible. The public benefits by having these well trained physicians enter into the practice of medicine in the State of Tennessee.

Applying the public policy considerations and special circumstances of Tennessee medical schools as described above by medical educators and administrators at ETSU to the facts of this case, we agree with the Trial Court that the covenant is enforceable against Dr. Mehta. We emphasize that this decision is limited to the facts of this particular case, and that each situation must be decided on its own merits. The involvement of ETSU, Quillen College of Medicine, as a named third party beneficiary of the covenant not to compete, was crucial to both the Trial Court's and our determination that the covenant not to compete should be enforced against Dr. Metha. This is not a situation where a physician leaves a purely private practice group and proceeds to compete against that private practice group. We express no opinion whether or not the public's interest would mandate the enforcement or non-enforcement of a covenant not to compete involving a physician's leaving his private practice group to compete against that private practice group.

The public's interest in having an accredited medical school in upper East Tennessee

cannot be questioned. The public's interest in ETSU's being able to recruit and retain skilled faculty members cannot be questioned. The public's interest in ETSU having stability in its patient population base to enable it to provide sufficient and adequate exposure to patients to its residents, interns and medical students cannot be questioned. We find these public interests to be of paramount importance in resolving this dispute. All elements necessary to the enforcement of the covenant not to compete are present here. We affirm the judgment of the Trial Court on issues one, two, and three.

Dr. Mehta next raises the issue that the Trial Court erred "in failing to find that there was not [sic] intentional/negligent misrepresentation relating to his inducement to sign the employment contract containing the covenant." The Trial Court found that Dr. Mehta had not carried his burden of proving misrepresentation.

In Tennessee, negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Robinson v. Omer,* 952 S.W.2d 423, 426 (Tenn. 1997), quoting Restatement (Second) of Torts, § 552 (1977).

The statute of limitations for negligent misrepresentation is three years from the accruing of the cause of action. *City State Bank v. Dean Witter Reynolds, Inc.,* 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) perm. app. denied (Tenn. 1997); T.C.A § 28-3-105.

Intentional misrepresentation in Tennessee is fraud in the inducement of a contract, the old common law action of deceit, for which the statute of limitations is three years. *Alexander v. Third National Bank,* 915 S.W.2d 797, 799 (Tenn. 1996), quoting *Vance v. Schulder,* 547 S.W.2d 927 (Tenn. 1977); T.C.A § 28-3-105.

A cause of action accrues for either intentional or negligent misrepresentation when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof. *City State Bank v. Reynolds* at 735.

In this case, Dr. Mehta knew or should have known soon after accepting employment in 1986 that other physicians were not required to sign the covenant. His contract of employment provides that Minutes of the Board of Directors of MEAC are integrated into the contract, and he testified that those minutes were made available to him. The resolution adopting the covenant, as well as the votes allowing each deviation or release from the terms of a covenant not to compete, were placed in the Minutes of the Board of Directors. The record is clear that Dr. Mehta knew or should have discovered long before July 10, 1994 ". . .his injury and the cause thereof." Since Dr. Mehta did not make any claim against MEAC or ETSU for misrepresentation until July 10, 1997, when he filed his Answer in this case, his claim of negligent/intentional misrepresentation is not timely, and Defendant's issue four is without merit..

Dr. Mehta next raises the issue that the Trial Court erred in failing to find that MEAC and ETSU had waived their entitlement to enforcement of the covenant by their actions. The Trial Court found:

> As to waiver, it is true that certain physicians who were subject to the restrictive covenant were released from it and immediately allowed to establish a practice in the restricted area. However, these were generally local physicians who had prior ties to the community. As noted earlier, psychiatrists were not required to sign the covenant. The fact that some few physicians have been released from the covenant does not constitute a waiver by MEAC of its right to enforce that part of the agreement and the Court so FINDS and HOLDS. *See* 28 Am.Jur.2d *Estoppel and Waiver* § 154.

In Tennessee, "[w]aiver is a voluntary relinquishment of some right, a foregoing or giving up of some benefit or advantage, which, but for such waiver, he would have enjoyed. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive." *Knoxville Rod and Bearing, Inc. v. Bettis,* 672 S.W.2d 203, 207 (Tenn. Ct. App. 1983) *perm. app. denied* (Tenn. 1984). The acts or course of conduct must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver. *Id.* In this case, all of MEAC's acts clearly indicate a determination to enforce the covenant rather than to waive it.

Each time a physician sought release from the covenant, the Board of Directors of MEAC discussed the circumstances, determined whether special circumstances existed and voted on the matter. There is nothing in the record indicating that any physician was ever released from the covenant without specific approval of the Board of Directors. Nor were any of the releases *pro forma.* There were very few releases over the eleven years in question, and each one was shown to be rationally based on special facts. Employers should be encouraged to make an independent determination concerning each employee as to whether or not it is necessary to enforce a covenant not to compete. If we accept Dr. Mehta's position, we will tell employers that if they wish to retain the right to enforce a covenant not to compete against any employee, they must enforce all covenants not to compete even if such enforcement is not necessary to protect the employer's interest. We decline to do this. The record is clear that when Dr. Mehta gave notice of his resignation, MEAC and ETSU informed him that they would enforce his covenant not to compete. We find no evidence in the record to support Dr. Mehta's contention that MEAC waived the covenant, and therefore we affirm the ruling of the Trial Court on Dr. Mehta's issue number five.

Next Dr. Mehta raises the issue that the Trial Court erred in not finding that MEAC and ETSU breached its contract with him for failure to provide adequate equipment, space, research funds, and facilities. The Trial Court found:

> There is insufficient proof that Mehta was not furnished adequate space or facilities to operate his practice. It is understandable that he wanted more of everything, but budget constraints in a state-supported university will not always permit that.

Dr. Mehta's employment contract permits the Board of Directors of MEAC to determine the extent of their responsibility for his office space, equipment and other expenses. The contract provides, as pertinent:

> **20. Office Space, Equipment, and Other Expenses.** First party [MEAC] agrees to provide to Second Party [Dr. Mehta] such office space, equipment, and other appropriate expenses as may be necessary for him/her to perform his/her services as outlined herein and as determined and approved by the Board of Directors. Second Party agrees to pay all other professional expenses not covered by First Party.

The record indicates that Dr. Mehta had meetings, both within the Pediatric Department

and with the President of ETSU and MEAC, seeking to resolve his complaints about office space. The situation at that time was not optimal for any members of the Pediatric Department faculty. Dr. Adebonojo had accommodated Dr. Mehta when his office was moved from Kingsport to Johnson City by renting special office space for him at an annual cost to MEAC of $67,000. Adebonojo testified that he was unable to justify the rental expense in terms of the overall department budget as TennCare changes began to severely decrease income. Other faculty members testified that the office space was small for all of them. It does not appear that Dr. Mehta was singled out for inadequate provisions. We agree with the Trial Court that "budget constraints in a state-supported university" are legitimate considerations. The findings of fact of the Trial Court on this issue are presumed correct unless the preponderance of the evidence is otherwise. We affirm the judgment of the Trial Court on this issue.

Dr. Mehta's last issue is that the Trial Court erred in awarding damages and the computation of the same as well as erred in granting a five-year enforceable covenant. As to the damages, the Trial Court found:

> The Court, utilizing Schedule A of the Pershing Yoakley report presented by Martin Brown (Trial exhibit 32) finds damages from May 1, 1997 to June 15, 1999 to be $358,265.00.

Both Dr. Mehta and MEAC cite *Chisholm & Moore Mfg. v. U. S. Canopy Co.,* 77 S.W. 1062 (Tenn. 1903) as controlling on the issue of whether lost profits are recoverable in a claim for breach of contract. That case was most recently considered in *Wachtel v. Western Sizzlin,* 986 S.W.2d 2, 6 (Tenn. Ct. App. 1998) *perm. app. denied* (Tenn. 1999). The *Wachtel* Court affirmed the long-held principle that remote and speculative damages may not be recovered for a breach of contract, but contract damages that are proved with reasonable certainty may be recovered.

Dr. Mehta argues that MEAC's financial expert witness, Martin Brown, a C.P.A. with Pershing Yoakley & Associates, "did nothing more than project Mehta's cash flow over time without any substantiation as to factors such as new physicians coming to the area, population changes, and changes in insurance requirements which would obviously effect [sic] any patient base." Dr. Mehta failed to provide any countervailing expert financial testimony. We have reviewed the "Damage Estimate

Report - Medical Education Assistance Corporation - Pediatric Cardiology Division" prepared by Pershing Yoakley and introduced at trial by MEAC. Like the Trial Court, we find the 25-page report to be comprehensive and credible. Accordingly, we find the Trial Court did not err in relying on this unrebutted expert evidence to set damages in this case.

As stated earlier, the Trial Court, after awarding damages of $358,265 to MEAC, also enjoined Dr. Mehta from practicing in the restricted area for a period of five years from the date of the Trial Court's June 14, 1999 order. Dr. Mehta argues that the Trial Court's decision, in effect, converts the five year restriction into a seven year restriction. There is merit to Dr. Mehta's position. As expressed above, MEAC has a legitimate contractual interest to protect through this covenant not to compete, as does ETSU. However, MEAC's and ETSU's interests are not identical. ETSU's sole interest is in prohibiting Dr. Mehta from practicing in the restricted area. MEAC wishes to recover monetary damages from Dr. Mehta as well as prohibit him from practicing in the restricted area. There is overlap in that MEAC provides 31% of ETSU Medical School's total annual budget. This fact situation requires this Court to balance the legitimate interests of these parties to enforce a reasonable covenant not to compete. Dr. Mehta should not be allowed simply to buy completely out of the covenant not to compete by paying MEAC damages as such would not protect the legitimate and compelling interests of ETSU. However, Dr. Mehta should not have his five year covenant not to compete transformed into a seven year covenant not to compete. For these reasons, it is our opinion that a reasonable enforcement of this covenant not to compete requires that the monetary damages against Dr. Mehta be affirmed, that the covenant not to compete be enforced for a two year period beginning 30 days from the date of entry of our judgment, and that MEAC be awarded additional damages from Dr. Mehta for the time of his continued competition from the date of the Trial Court's judgment through the date of entry of our judgment.

MEAC raises one issue on appeal, that the Trial Court erred in awarding Dr. Mehta six months' severance pay as provided under his contract with MEAC.

On July 9, 1999, the Trial Court heard Defendant's Motion to Alter or Amend and

overruled the motion "except as follows:"

> (i) that the Court is of the opinion that the damage award made to the plaintiff MEAC should be reduced by the amount representing the six months severance pay which was provided in paragraph 15 of Dr. Mehta's Professional Services Agreement which the Court finds Dr. Mehta was entitled to receive and the parties stipulate that amount to be $21,050.50 . . . .

The Trial Court then ordered plaintiff's damage award reduced by $21,050.50 to a total of $337,214.95.

MEAC argues that Dr. Mehta is not entitled to recover the severance pay because he breached the employment contract by leaving MEAC and setting up a competing practice. Dr. Mehta argues that the severance pay was based on a percentage of fees already earned prior to his leaving, and that "as the Trial Court found, Mehta would be entitled to a set off for those amounts against the judgment awarded to MEAC on a theory that MEAC would be unjustly enriched if it received both damages and the monies due Mehta from his collections."

"Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist [citation omitted]. Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Whitehaven Community Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn. 1998).

The award to Dr. Mehta is not an issue of unjust enrichment. It is an issue of the enforcement of the terms of the contract. We have required Dr. Mehta to abide by his obligation not to compete against MEAC and ETSU and to pay damages to MEAC for the breach of that obligation. It follows that, in the enforcement of this contract between the parties, fundamental fairness requires that MEAC also uphold its end of the bargain. Accordingly, we affirm the Trial Court's award of severance pay to Dr. Mehta under the terms of the contract.

## CONCLUSION

The judgment of the Trial Court is affirmed as modified and this cause is remanded to the

Trial Court for a determination of the additional damages due from Dr. Mehta to MEAC and for such further proceedings, as may be required, consistent with this Opinion. The costs on appeal are assessed against the Appellant, Dr. Ashok V. Mehta.

_____
D. MICHAEL SWINEY, J.

CONCUR:

_____
HOUSTON M. GODDARD, P.J.

_____
CHARLES D. SUSANO, JR., J.