THOMAS L. HERBERT, JR., Complainant-Appellee, v.
W. G. BUSH & COMPANY et al., Defendants-Appellants.
—298 S. W. (2d) 747.

Middle Section.  August 31, 1956.

Petition for Certiorari denied by Supreme Court, December 7, 1956.

Howard, Davis, Boult & Hunt, Nashville, for appellants.

Waller, Davis & Lansden, Nashville, for appellee.

HICKERSON, J. Thomas L. Herbert, Jr., sold certain stock which he owned, or controlled, in W. G. Bush & Company to the corporation. As a condition for the sale and purchase of this stock the corporation required and T. L. Herbert, Jr., gave a covenant not to compete with Bush in its business for twenty-five years. Thomas L. Herbert, Jr., filed the bill to strike down this part of the agreement on the ground that it was in restraint of trade and void under the statute of Tennessee, Code sec. 5880; and, furthermore, the agreement not to compete was invalid and void in that it was in violation of the provisions of the Sherman Anti-Trust Act, Title 15 U. S. C. A. secs. 1 and 2.

Defense was made that the agreement not to compete did not violate the state statute, or the Federal Act. Estoppel was, also, pleaded.

The Chancellor sustained the bill and decreed that the agreement not to compete was void because it violated the state statute; and that complainant was not estopped to prosecute his bill.

The concluding paragraph of the opinion states:

"Having reached the results set forth herein, it is not necessary for the Court to consider and determine whether or not said agreement violates the Sherman Anti-Trust Act, Title 15 U. S. C. A. secs. 1 and 2, and this question is pretermitted."

Defendants assign four errors which made two questions:

1. Did the Chancellor err in holding that the agreement not to compete, "violates the public policy of the State of Tennessee as expressed in sec. 5880 of the Code of Tennessee, 1932, and is null, void, unenforceable, and of no binding effect on either of the parties"?

2. Did the Chancellor err in refusing to hold and decree, "that complainant is estopped to retain the benefits of a contract and at the same time to challenge as contrary to public policy the obligation imposed upon him by such contract"?

Complainant assigned one error, as follows:
"The Chancellor erred in not holding and decreeing that the agreement of Thomas L. Herbert, Jr., not to compete with the defendants was in violation of the Sherman Anti-Trust Act and invalid and unenforceable. 15 U. S. C. A. secs. 1 and 2."

Since the state statute is more favorable to the contentions of complainant than the Federal Act, we are sat-

isfied with the disposition which the Chancellor made of the question presented by the assignment of error filed in behalf of complainant. Therefore, complainant's assignment is overruled.

(1) Tennessee Code of 1932, sec. 5880, provides:

"Trusts and combinations are unlawful and void. —All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article are declared to be against public policy, unlawful, and void."

W. G. Bush & Company, herein called Bush, was organized prior to 1920. Complainant was elected the first President of Bush and served the corporation in that capacity until February 1, 1949, when he was discharged.

T. L. Herbert & Sons is a wholly owned subsidiary of Bush and Sangravl Company is a wholly owned subsidiary of T. L. Herbert & Sons. Wherefore, Bush is the owner of the two other corporate defendants.

Bush is engaged in the manufacture and sale of brick. T. L. Herbert & Sons is engaged in the business of building supplies. Sangravl Company is engaged in the Sand and gravel business.

On February 1, 1949, complainant was Vice President and General Manager of T. L. Herbert & Sons and President of Sangravl Company. His position with these two companies was terminated at the time he was discharged as President of Bush.

The Herbert family is the owner of most of the capital stock of Bush. For practical purposes, it is a family corporation. Complainant and certain trusts created by him of which he is cotrustee were the owners of the following capital stock in Bush:

"T. L. Herbert, Jr._____ 4,726 shares

Commerce Union Bank and T. L. Herbert, Jr., Trustees
    U/A T. L. Herbert, Jr., 4-1-38_____ 4,240 shares

Commerce Union Bank and T. L. Herbert, Jr., Trustees
    U/A T. L. Herbert, Jr., 12-31-42_____ 5,050 shares

Commerce Union Bank and T. L. Herbert, Jr., Trustee
    U/A T. L. Herbert, Jr., 12-28-43_____ 240 shares."

We shall refer to this stock as complainant's stock, since it seems he controlled the trust stock. All the shares owned and controlled by complainant represented about 25% to 30% of the capital stock of Bush.

When complainant was discharged, he became extremely dissatisfied with the management of Bush. He was afraid the stock would depreciate in value to his detriment. For that reason, he was anxious to sell his stock. There was no market for the stock unless Bush or some member of the Herbert family would buy it. This put the holders of the majority stock in advantageous bargaining

position. Neither Bush nor the majority stockholders were under a moral or legal obligation to buy complainant's stock. On the other hand, complainant was under no compulsion to sell the stock, except his distrust of the management.

Bush occupied an excellent position in the operation of its business at the time complainant was discharged, for some time prior thereto, and since that time. The only competition of any consequence which it had in Middle Tennessee, its trade area, was T. L. Lewis & Sons of Nashville, Tennessee. Bush had a capacity of twenty-four million common brick a year. Lewis had a capacity of one million four hundred forty thousand common brick a year. This difference in the size and capacities of the two companies were such that Bush, for all practical purposes, dominated the brick industry in the territory which it served. Complainant had been a potent force in building and developing this condition and position for Bush.

Thus circumstanced negotiations began for the sale of complainant's stock to Bush or to the majority stockholders. Mr. Alfred D. Sharp was the broker who represented the seller and the buyer. The negotiations lasted about fourteen months. Bush refused to take the stock unless complainant would agree not to compete for a term of twenty-five years. The result of the negotiations was the sale of the stock to Bush for $33.50 a share, or a total of $489,515.40, which was paid in cash. According to the contract of sale, complainant executed and delivered to Bush the following agreement not to compete:

"Therefore, in consideration of the purchase of said 14,256 shares of the capital stock of W. G. Bush & Company, Thomas L. Herbert, Jr., hereby agrees

that he will not directly or indirectly engage in any business which is competitive with W. G. Bush & Company, T. L. Herbert & Sons, or SanGravl Company, or any one or more of them, in any area in which any one or more of said companies are now operating, for a period of twenty-five years from and after the date of this letter.''

In Standard Oil Co. v. State, 117 Tenn. 618, 659, 100 S. W. 705, 715, 10 L. R. A., N. S., 1015, our Supreme Court construed the Tennessee statute and said:

''The making of the agreement with Love, with a view to lessen competition, and which tended to do so, is thus fully proven. This is all that is necessary to constitute a violation of the statute. The statute was not only intended to prohibit contracts and combination between those engaged in the same business, made for the purpose, or which had a tendency, to destroy all competition, and which are injurious to the whole public, but those made and formed by any and all persons with a view, or which in their nature tend, to lessen competition to any material extent, to the injury of any part of the people of the state. The number of persons, generally speaking, engaged in the conspiracy, the extent of the territory affected, the degree which it was intended or has a tendency to lessen competition, the extent of the injury to the public, or whether it be permanent or temporary in its character, are not material elements of the offense. The form of the combination is also a matter of indifference. No forms or precedents are followed in the commission of crime. In any form the agreement may be made, or disguise in which it may ap-

pear, or whatever scheme may be adopted to accomplish the prohibited acts, it is within the statute. It is enough that the contract was made with a view to lessen competition in the sale of an article of commerce of prime necessity, and that it is injurious to the public, however limited and restricted it may be in its scope, effect, duration. It is its purpose, tendency, and effect that makes it unlawful.

"Contracts of the character made by these parties were unlawful under the common law, and those engaged in them subject to indictment.

"This court, construing a statute containing the same provisions of the one here applied, through Mr. Justice Caldwell, said:

" 'Courts are practically unanimous in holding that contracts, agreements, arrangements, or combinations, in whatever form or name, are contrary to public policy and void, when they tend to impair competition in trade and to enhance prices to the injury of the public. * * * It is not the number of persons participating in the by-law (the illegal agreement in that case), or the extent of the territory included, but the injury to the public in that territory, however restricted, that characterizes the interruption of trade as illegal.' Bailey v. Master Plumbers, 103 Tenn. 99, [106] 114, 52 S. W. 853, 46 L. R. A. 561."

In Baird v. Smith, 128 Tenn. 410, 161 S. W. 492, L. R. A. 1917A, 376, our Supreme Court construed this statute to mean that the restraint of trade under the contract not to compete must be undue and unreasonable before such agreement would be stricken down on the ground that it tended, "to lessen free and full competi-

tion.'' The latter part of Code sec. 5880 expressly provides:

"All arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.''

The proof shows, without dispute, that complainant intends to go into the business of manufacturing brick if he is not prevented from doing so by his covenant not to compete. His proposed new plant will be located in Davidson County, Tennessee, at an initial cost of $600,-000. The new concern will be in direct competition with Bush. The result will be that consumers will be able to buy common brick at a reduced price ranging from $5 to $8 a thousand. This will be a reduction in price of 20% to 25% of the present cost price. This reduction will result directly from the competition caused by the new plant which complainant proposes to build.

We recognize the rule that a covenant not to compete made in connection with a sale of a business or part of a business is frequently held valid as being a part of the property sold in connection especially with its good will, and that such covenant is necessary for the protection of the property purchased. Baird v. Smith, 128 Tenn. 410, 161 S. W. 492, L. R. A. 1917A, 376; Bradford & Carson v. Montgomery Furniture Co., 115 Tenn. 610, 92 S. W. 1104, 9 L. R. A., N. S., 979; Jackson v. Byrns, 103 Tenn. 698, 54 S. W. 984; Scott v. McReynolds, 36 Tenn. App. 289, 255 S. W. (2d) 401.

We concur in the conclusion of the Chancellor that

the agreement in question tends to lessen full and free competition in the manufacture and sale of common brick and tends to control the price or cost of common brick to the consumer in the trade area involved.

Each case must stand on its own facts involving contracts of this sort. The facts and circumstances surrounding the giving of this agreement not to compete clearly sustain the conclusion which the Chancellor reached and in which we concur.

Since the contract in question did tend to lessen full and free competition in the manufacture and sale of common brick, the Tennessee Statute expressly declares such contract, "to be against public policy, unlawful, and void." Sec. 5880.

(2) Is complainant estopped to retain the benefits of his contract and at the same time challengè, as contrary to public policy, the obligation imposed upon him by the contract?

This is not a suit to rescind the contract, nor is any offer made to refund the sale price of the stock; $489,-515.40. Apparently from the pleadings, neither party wanted to rescind the contract.

It is the contention of complainant that he can maintain his bill to strike down the covenant not to compete and retain the benefits of the sale of the stock when the covenant not to compete is against the public policy of the state.

To support his contention, plantiff cites Darnell-Love Lumber Co. v. Wiggs, 144 Tenn. 113, 230 S. W. 391; Peck-Williamson Heating & Ventilating Co. v. McKnight & Merz, 140 Tenn. 563, 580, 205 S. W. 419; Porter v. Jones,

46 Tenn. 313; Hale v. Sharp, 44 Tenn. 275; Rucker v. Wynne, 39 Tenn. 617; Palmer Brothers v. Havens, 29 Tenn. App. 8, 193 S. W. (2d) 91.

To the contrary, defendants contend that complainant could not retain the benefits of his contract and maintain a suit to declare void the agreement not to compete on the ground such contract violates the statute of Tennessee, Code sec. 5880, and that the contract is against the public policy of the state.

To support their contentions, defendants cite Joy v. City of St. Louis, 138 U. S. 1, 11 S. Ct. 243, 34 L. Ed. 843; Broxham v. Borden's Farm Products, 7 Cir., 53 F. (2d) 946; Harrison v. Glucose Sugar Refining Co., 7 Cir., 116 F. 304, 58 L. R. A. 915.

After a review of these and other authorities, we find the law in Tennessee to be: Generally, the court will not aid either party to enforce an executed illegal contract. A contract may be executed on one side and executory on the other side. If a contract is against the public policy of the state and the best interests of the public are far superior to any private interest of the parties, the courts will overlook the individual wrong of a party to the contract by which he forfeits his private right and enter a decree at his suit which will protect the public interests.

The question rests in the sound discretion of the court. The theory of the rule is that the court is not granting the individual any relief, but that the relief should be given which the public welfare requires. Such relief is given to the public through the party to the contract, although the individual party benefits from the relief given to the public. The court interferes for the sake of the

public, not of the individual party although at the suit of the individual party.

■ Wherefore, when the public interest demands that an illegal contract be declared void, such decree will be entered even though the party seeking the decree has received benefits under the contract for which he does not account. The situation of the parties is immaterial. The public interest is paramount and should be protected.

■ In the case on trial the public interest in having this contract not to compete declared void is far superior to the interest of defendants in having this illegal contract enforced. Code sec. 5880 was enacted to protect the public. Its violation is expressly declared to be against public policy. If the agreement not to compete is declared void, the public in the trade area involved will benefit by being able to purchase brick at a reduction of $5 to $8 a thousand, or at a saving of 20% to 25% of the present cost price.

To the contrary, it would seem that defendants would suffer very little on account of the damage complainant could do them, because he was one the chief officer of defendants. That is the only legitimate ground upon which defendants could base their claim to a detriment to them. On February 1, 1957, eight years will have gone by since complainant has had any connection with defendants. Evidently defendants did not think complainant added much to the good will of these corporations on February 1, 1949, for they discharged him on that date. Certainly, at this late date, defendants would suffer very little, if any, detriment to their "good will" if complainant should go back into business. It is true, defendants might suffer by having strong competition in their trade

area in a general way; but this is the very condition the statute was designed to foster and promote: "full and free competition."

Having this view, we certainly cannot say that the Chancellor abused his discretion. Indeed, we think the record justifies his decree.

Overrule the assignments and affirm. Remand to the Chancery Court to enforce the decree. Tax all costs against the original defendants, appellants in this Court.

Felts and Shriver, JJ., concur.