# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
January 13, 2015 Session

## PLASTIC SURGERY ASSOCIATES OF KINGSPORT INC v. GREGORY H. PASTRICK

### Appeal from the Circuit Court for Sullivan County
No. C35389C     E. G. Moody, Judge

---

### No. E2014-01203-COA-R3-CV-FILED-MAY 19, 2015

---

This action was filed against a surgeon for breach of an employment agreement by his employers, a group owned equally by four optometrists and one non-physician. The trial court found that the group was entitled to recover damages arising from the breach. The surgeon appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Russell W. Adkins and Frank A. Johnstone, Kingsport, Tennessee, for the appellant, Gregory H. Pastrick.

Thomas C. Jessee, Johnson City, Tennessee, for the appellee, Plastic Surgery Associates of Kingsport, Inc.

## OPINION

## I. BACKGROUND

Plastic Surgery Associates of Kingsport, Inc. ("PSA"), dba Southern Plastic Surgeons ("SPS"), was chartered in 1999 to meet patient demands for plastic surgery services in Kingsport, Tennessee. PSA's shares were owned by Specialty Medical Services, LLC ("SMS"), an entity that provides management services to the Regional Eye

Center ("EYE") and other entities. SMS is owned equally by the four physicians from EYE and Mr. John T. Williams, EYE's Chief Executive Officer. Mr. Williams is not a physician. The Board of Directors of PSA consisted of C. Robert Bice, Jr., M.D.; John L. Chapman, M.D.; Eric K. Smith, M.D.; Anthony D. Seaton, M.D.; and Mr. Williams. PSA, pursuant to a management agreement with SMS, agreed to pay 15% of its revenues as compensation for management services. PSA was incorporated as a general purpose corporation - not as a professional corporation.

Wellmont Health System ("Wellmont") assisted PSA in the initial recruitment of a plastic surgeon to join the new practice. According to the defendant, Gregory Pastrick, M.D., near the end of his residency, he received a letter from Wellmont advertising a job opportunity in Kingsport. Wellmont put him in contact with Mr. Williams, with whom he had several conversations regarding the position.[1] After consultations with his attorney and counsel for PSA, Dr. Pastrick decided to join the practice. Mr. Williams worked closely with Dr. Pastrick to determine everything that would be needed for the clinical part of the business, and PSA spent a significant amount of time and money equipping the office with staff, equipment, and supplies.

Dr. Pastrick and PSA entered into an Employment Agreement ("the Agreement") on August 30, 1999, the terms of which extended through August 30, 2001. The Agreement provided that it would automatically extend for two more years absent written notice of non-renewal. Dr. Pastrick was permitted to terminate the Agreement for any reason upon 180 days written notice. The Agreement stated that in the event Dr. Pastrick breached the notice provision, "any amounts otherwise owed by Company to Employee as of the date of its actual termination in the form of any Bonus . . . shall be retained by Company as liquidated damages. Said liquidated damages shall be the sole remedy for Company . . . ." Absent cause, Dr. Pastrick could be terminated upon 180 written days' notice.

Paragraph 8.1 of the Employment Agreement provided the amount of Dr. Pastrick's compensation for the first two years of employment. In accordance with Paragraph 8.1, Dr. Pastrick received $120,000.00 in the first year and $175,000.00 in the second year. After the initial two-year term of the contract, Dr. Pastrick's compensation was to be calculated by the formula set forth in Paragraph 8.2. Dr. Pastrick requested that additional language be included in Paragraph 8.2, to which PSA agreed. Accordingly, the terms of Paragraph 8.2, as modified by the parties, provided as follows:

> **8.2** After the initial two year term of this contract, Company shall pay Employee 80% of Net Profits as salary. "Net Profits" are defined as all amounts collected on behalf of Company on account of services provided to patients by

---

[1] Wellmont paid money toward Dr. Pastrick's salary for the first two years.

Employee minus Employee's pro rata share of operating expenses, costs, reimbursements to patients or insurers and other bonuses as may be given to Employee. "Net Profits" also shall include the amount Company collects on behalf of other physician-employees which bears a substantial relationship to Employee's ownership interest in the Company.

Beginning August 30, 2001, Dr. Pastrick began drawing his salary calculated at 80% of Net Profits pursuant to the Agreement. According to PSA, the final calculation for the determination of income is done on a yearly basis. Thus, Dr. Pastrick was paid an amount in advance each month with any excess in income at the end of the year to be paid to Dr. Pastrick and any excess in expenses to be paid back to PSA.

Paula Smith, EYE's financial manager, testified as follows:

Q. Okay. Now explain to the Court how Dr. Pastrick was compensated according to the books and records of the company after August 30th, 2001 when this contract was just extended? So from August to December how was he paid?

A. From August to December he was continued to be paid at $175,000.00 base rate on a salary basis.

Q. Okay, would you agree with me that 8.2 provides that after the two years he was to be paid 80% of net profits as salary?

A. That's correct. Yes.

Q. Why did you not pay net profits from that point between August and December?

A. During that time . . . Dr. Pastrick and the owners of Southern Plastic were in negotiation as to buy-in and Dr. Pastrick had wanted . . . a higher cash flow than the hundred and seventy-five. There is no way to identify 80% of the profits on a monthly basis. This is 80% of an annual profit being a twelve month business cycle, not 80% of any one month, so there was really no way to identify what 80% of the profit would be on any given day.

* * *

. . . In November an agreement was reached on a cash flow that Dr. Pastrick felt was adequate and the owners could live with or could feel reasonable about and it was effective December 1st, 2001.

Q. Okay, did that, did that formula ever modify 8.2, which is 80% of net profits?

A. No.

Paragraph 12.1of the Agreement allowed that upon the completion of the first two years of employment, PSA could, within its sole discretion, provide Dr. Pastrick with an option to buy-in to the practice. The initial percentage of ownership to be purchased by the Employee was 50% of the Company's shares. As set forth in Paragraph 12.2 of the Agreement, the Employee's ownership interest in the practice would increase gradually until the Employee eventually would own 100% of PSA.

After the initial two-year period of Dr. Pastrick's employment, Mr. Williams notified him of the board's decision to offer him the buy-in option. According to Mr. Williams, at that time, Dr. Pastrick indicated a desire to become an owner and the parties began negotiating the terms of the purchase. Dr. Pastrick observed in his answer to the complaint that the proposal to become an owner was the first time he "became aware of the fact that the shareholders" of PSA "had little, if any, equity in the corporation, that the corporation was heavily in debt, and that without additional physicians in the practice . . . sufficient revenues would not be generated to meet the financial obligations of the business while providing [Dr. Pastrick] reasonable compensation."

By mutual verbal agreement, beginning December 1, 2001, PSA began paying Dr. Pastrick monthly in the amount of 30% of PSA's gross monthly receipts. Ms. Smith related the following regarding Dr. Pastrick's compensation:

Q. . . . [W]ere you the person who calculated the amount of Dr. Pastrick's paychecks from the time period of December 1st, 2001 forward?

A. I calculated the 30% of the draw, yes.

* * *

. . . [T]he paycheck part was based, the total amount, paycheck plus benefits, was based on 30% of gross revenue.

Dr. Pastrick contends that Paragraph 8.2 became inapplicable during the negotiations, as the parties had agreed upon a new method of compensation. He asserts that PSA had agreed to compensate him based upon 30% of gross monthly receipts with PSA assuming full responsibility for the overhead obligations until such time as negotiations concluded. Mr. Williams observed, however, that Dr. Pastrick's annual compensation still remained at 80% of Net Profits as defined in Paragraph 8.2, the larger draws subject to a "trueing up" process at the end of the year. Mr. Williams remarked that compensation to Dr. Pastrick changed to an owner formula in accordance with Paragraph 11 of the Agreement.[2] He testified further as follows:

> Q. . . . Just explain to the Court what, what he was going to get. He said 30%, but this contract remained in effect so he got 80% of net profits as salary? Is that correct?
>
> A. That's correct.
>
> Q. And he got that from the end of August until January of the following year?
>
> A. That's correct.
>
> Q. Then how did it change in January?
>
> * * *
>
> A. . . . He went to First Tennessee Bank and he then told us that they had determined that they were not going to loan him the money [for the buy-in] because he had significant personal debt for his home.
>
> * * *
>
> He said they, they denied and so they won't loan me the money and I don't remember the exact words, but the conversation was so what do we do now? Do you still want to buy in? Yes. So again I got the board of directors of the company together and we agreed that we would finance that buy-in and requested a $25,000.00 down payment.
>
> Q. Okay.

---

[2]Other benefits provided to Dr. Pastrick included the following: 401(k), car, and health, malpractice, life, and disability insurance.

A. So he said that would be fine and then the middle of December he told me he couldn't pay the $25,000.00. It would be financed 100%. When we had that conversation he said that he understood that starting on January 1st he would get a draw of 30% of the net receipts against contract term of the profit.

Q. Okay.

A. And you know, we talked against about well, what's going to happen if that 80% at the end of the year is less than what you've already taken and he said he understood. Okay, so the board got back together and we said, okay, we've agreed to finance all but $25,000.00. He's asking us now to finance 100%. It doesn't seem practical or reasonable to call the deal off over $25,000.00 in the scope of the life of this business, so we agreed to finance 100%.

Q. And you told him accordingly?

A. Yes.

Q. Okay. And then what happened in this negotiation toward the buy-out?

A. Well, we proceeded in March and started, began paying as the draw and we have our, we had a partners' meeting in January and we invited him to come, an owners' meeting and we invited to come and said now that you are in that mode and being paid and treated as an owner, we invite you to come and participate and have a voice and he did. . . .

On March 28, 2002, PSA's Board of Directors faxed the following letter to Dr. Pastrick:

> The Board of Directors of Plastic Surgery Associates would like to thank you for your service to our company. It is our understanding, however, that you are not happy with the mutually signed agreement regarding the provisions for becoming a shareholder in the corporation. We would like to see this take place, however, we insist that any resolution

- 6 -

mechanism different from the original buy in plan must be fair to the existing owner and must provide a reasonable means for the practice to meet its current and future financial obligations. The previous letter from Mr. Eilers with an alternate plan for completing the buy in failed miserably on both of these grounds. We are happy to entertain any alternative proposals that are not punitive to the current owner. However, absent such a proposal, we expect that the buy in will take place as originally agreed to by all the parties. We do not feel that any additional discussions will be helpful unless you or your legal counsel have any questions regarding the intent of the original agreement, or until you have an acceptable alternative proposal. If you need us to assist you in such a proposal, our legal counsel, Mr. Klein, and our Chief Executive Officer, Mr. Williams, will be happy to help in any way possible.

We hope that our current impasse will come to a resolution quickly. We feel that the Board and owner have already been more than generous in assisting you in financing your obligation for completion of the agreement, but we are willing to evaluate any other acceptable alternative proposals that are fair to all parties involved.

Mr. Williams's testimony continued as follows:

A. . . . [I]n March Mr. Eilers told Mr. Kl[ein] that Greg didn't want to leave. That's the first time we had heard him even using that word. That he didn't want to leave but he had some financial hardship being driven by his house. And we didn't get much more out of it until in May we were given a letter . . . from Mr. Kirk, saying, you know, that he didn't think it was . . . a good, good buy-in. The thing is Mr. Kirk never got any information from us, so we don't know what information he based his, his opinion on.

* * *

Q. Okay. Tell the Court now we're in, I think May, what leads into this July 15th, 2002, what's called personal, confidential, hand-delivered letter of intent. Tell us how we got to that.

* * *

A. . . . [I]n this agreement we agreed that the $210,000.00 he paid we would not take it. It would be used to go against debts of the practice. . . .

Q. Okay. And it says that all shareholders in SPS will assume proportionate liability for the company debt. So you all were taking on pro-rata individual . . .?

A. Well, I wouldn't be a shareholder at this point, but yes.

* * *

Q. Okay. And so you had addressed all of the debt issues that he had raised concerns about? Is that a fair statement?

A. Yes, it's over here and he says he agrees to that provision, so yes.

Q. Okay, and then in paragraph 2 you were waiving the unpaid management fees?

A. That's correct.

Q. Okay. Now . . . page 2 of this letter, how did it come to, how did it come to be and how did you come to get it?

A. Well, page 2 Dr. Pastrick brought to the meeting.

Q. Okay.

A. And we looked at it and felt like there were a couple of things he had added that would not make good business sense to do and after we talked them through with, with Greg he agreed and so Dr. Pastrick and Dr. Smith, who was secretary of the company, and I as CEO initialed those changes, or strike-outs, and we all signed the agreement.

* * *

Q. Okay. Now what caused him if he wanted a surgeon to come, what caused him to decide to strike through hiring a new surgeon in six months and both of you initialed it?

A. Well, actually we, we could not agree that, you couldn't guarantee you would have someone in six months . . . .

On July 15, 2002, the parties signed a binding letter of intent which set forth the terms of the purchase as agreed to by the parties:

This letter is to . . . put into writing what has been worked out between you and the shareholder of Plastic Surgery Associates of Kingsport, Inc., dba Southern Plastic Surgeons (SPS) for your buy-in to the company. We are excited to make you the following offer binding on SPS and yourself once signed by both of us.

The Shareholders of SPS, will sell 50% of the corporation to Greg Pastrick, MD under the following terms and conditions:

1. The price for buy-in is $210,000. To be paid in monthly installments beginning six months after a second plastic surgeon becomes employed by the Corporation or August 1, 2003 whichever comes first. Payment schedule to be determined.

2. These payments will be used by the Corporation to reduce loan obligations of the Corporation.

3. Southern Management Services, LLC will waive unpaid management fees to the total amount of $210,000. These fees will be discharged as a debt of the practice proportionately to Dr. Pastrick's installment payments.

4. As consideration for the discharge of $210,000 in previously earned management fees, SPS will amend its practice management contract with Southern Management Services, LLC to a new term of 10 years beginning at a date that coincides with the execution of a sales agreement with Dr. Pastrick on the same terms and conditions of the current management agreement. However, all physician owners, excepting Specialty Medical Services, LLC, may agree to

shorten this term to 7 years with no renewal, if the ownership interests held by Specialty Medical Services, LLC are first bought out by these physician owners for $300,000 no later than August 1, 2009 and a full release is obtained for all members of Special Medical Services, LLC from all debt obligations related to SPS. Specialty Medical Services, LLC and its members may, but are not obligated to, finance the $300,000 buy-out.

5. All shareholders in SPS will assume proportionate liability for corporate debt and obligations that reflect their ownership. A renewed employment contract will be signed with similar terms as the current agreement and will reflect compensation/benefits and the change of ownership.

6. The legality of the corporate structure of SPS will be resolved to the mutual satisfaction of SPS, its shareholder, and Dr. Pastrick.

7. All documents for this purchase will be completed by August 6, 2002.

If this is satisfactory, please sign below to accept our offer. We look forward to the conclusion of this matter and welcoming you as an owner of Plastic Surgery Associates of Kingsport, Inc.

Mr. Williams described the continuing negotiations as follows:

Q. . . . When was the first time that you knew as, as the man sort of in charge of the day to day operations that Dr. Pastrick had no intention of going forward with this agreement?

A. Well, we had an August 6th deadline to go to the next step that we agreed to. I think it's in this. Yeah, the last point on the second page, to be completed by August 6th, 2002, and that deadline came and went and, but Greg asked for an extension of a week until August 13th, and he said they just needed more time to get his things together, so we said okay. That passed and so we asked at that point, Greg, we need to get this finished by the 23rd. And I gave him another ten days. Then he comes to me and, and in very blunt language

said our agreement was one sided and unfair and I said, Greg, we've given, no one has given us any objections. No specific thing. You just are saying this to me. Nobody has said here's what's wrong with it. Here's how it's different from the letter of intent. Not a word. You just come and tell me, and he, he seemed agitated when he said it, you know, that he was, it was one sided and unfair, but he agreed that we, that he hadn't asked for any other information and hadn't been, hadn't given us any specifics to deal with and we, our attorney, would not talk to our attorney and give us any specifics. So he told me that what he didn't like was the agreement was too complex and it shouldn't take that much paperwork to put a final agreement to these two pages. And so I told him, because I had seen the agreement and I said, well, this is a lot of paperwork for this, and our attorney told me, he said half of it is dealing with removing me as an owner and addressing the, the corporate structure chain.

\* \* \*

He said that's half the document. I said, okay, so I told Greg that, but you know, he didn't say much else about it, and so that was after August, around August 23rd. I don't know the exact date that that happened. On the, the next thing we heard from him was on August 26th when he filed suit to be removed from his non-compete.

Q. So he still hasn't told you he's not buying in, told you he hasn't honored the agreement.

A. No.

\* \* \*

Q. Okay, and then what happened next?

A. Well, . . . his lawyer told us that [Dr. Pastrick] wanted to open his own practice.

\* \* \*

That he wanted to open his own practice in Kingsport, but didn't have a specific timeframe. And Greg said to me I'm

going to leave. He came in to me and said I'm going to leave. Well, I kind of figured that out since he filed suit against us, but he said I'm going to leave, but I don't know when, and I believe his words were I'm in no big hurry and I said, so how are we supposed to operate our business if our medical provider is telling us I'm going to leave at some point. I said Greg, how can we make that work. He said, I don't know when it's going to be. I, I don't know. So we're meeting with our attorney. We decided that we would release him from the non-compete because it was pretty apparent we weren't going to have much luck him working with us, and on October 1st I told Dr. Pastrick that we had no choice but to close the practice because we knew he was leaving at some time. . . .

PSA contended in its complaint that it began paying Dr. Pastrick as though he was an owner in expectation that the negotiations for purchase would end successfully. According to PSA, throughout the negotiations, Dr. Pastrick was actively involved in the management of the practice, attending and participating in an owners' meeting. He recommended that PSA bring in another plastic surgeon to the practice, and based upon that recommendation, PSA began recruiting a new plastic surgeon with Dr. Pastrick's input and involvement. It is admitted, however, that Dr. Pastrick was never issued shares. Ms. Smith additionally testified that

once Dr. Pastrick notified that he would not be staying with the company, we started the trueing up process to calculate that and we did not continue [his payment] arrangement because that was coming to an end. We did a trueing up to match what had already been paid up to 30% against the 80% in the contract.

She acknowledged that Dr. Pastrick received no further salary because "he was already over-compensated from the 80%." Dr. Pastrick drew the sum of $183,881 as an advance against income earned from December 1, 2001 through October 11, 2002. Computing the income earned and expenses in accordance with the Agreement, PSA claims Dr. Pastrick drew $246,633 over and above his entitled compensation.

Dr. Pastrick testified that he "intended to uphold what was in" the letter of intent, "but when the new contract for the actual buy-in was presented, it was . . . one sided and it was not reflecting this." He claimed that he "wasn't an owner" and "had no shares." According to Dr. Pastrick, he "didn't attend owners' meetings. . . ." He testified further regarding the formal buy in contract:

[I]t was a little one-sided and over-powering document on their side basically . . . . [I]t asked my wife to sign some documents as well as a security agreement . . . . [T]he unpaid management fee of $210,000.00 which we had agreed on [in] the letter of intent which the, the actual official contract didn't have that in there, and then as well as the additional debt that came up after that letter of intent which was $127,000.00 plus dollars that Plastic Surgery Associates owed to the Regional Eye Center.

Dr. Pastrick related that after discussions with an accountant and counsel, he became concerned about the debt of the company. He feared that going forward, "[i]t didn't look like it was going to be viable."

Thereafter, without giving any specific reasons, Dr. Pastrick delayed finalizing the buy-in. On August 26, 2002, he filed the lawsuit against PSA to be removed from the non-compete clause in the Agreement. Dr. Pastrick testified at trial as follows regarding the lawsuit:

Q. . . . First of all did you tell them that you would not be fulfilling your agreement?

A. To buy in?

Q. Your agreement to, your agreement to continue in your relationship as an employee?

A. Oh, no, I basically told them that I wasn't interest[ed] in, in buying in but that I would continue to work in the company's employ and I would be willing to stay even to help them bring somebody in to take my place basically, because eventually that I would be leaving.

Q. Did you file in August of 2002 a declaratory judgment action?

A. Yes.

Q. Why?

A. The main reason was to get out of the non-compete because I wanted to keep my options open because I could

- 13 -

see that this relationship was deteriorating and that they, they may fire me or want me out quickly and I wanted, and I still had a debt obligation to Wellmont through the practice assistance agreement that was going to be relieved over a period of four years, so in other words I owed Wellmont money that was basically a loan from Wellmont on the salary and some of the overhead payments, but that debt would be relieved over a period of service in four years if I remained in the community and practiced at, at Wellmont. But this was in the third year so I still had another year of obligation to Wellmont and with a non-compete if they fired me it would close the door. Then I would not be able to remain in the area to fulfill my obligation to Wellmont, so that, that was basically the reason that I wanted to remain in the community to fulfill my obligation to Wellmont and then frankly we liked it here and that's why I'm still here because it's a nice community and a great place to practice . . . .

After filing the lawsuit, Dr. Pastrick, the only plastic surgeon in the practice, told PSA that he would be leaving and intended to open his own office. PSA contends it had no choice but to close thereafter on October 11, 2002. Dr. Pastrick started Plastic Surgery Center of East Tennessee, his new medical practice located in Kingsport, in October 2002, shortly after PSA closed.

The trial court found, inter alia, as follows:

6. The Court finds that Pastrick failed to satisfy the written notice requirement set forth in paragraph 6.2 of the Employment Agreement. According to the testimony provided at trial, Pastrick filed suit on August 26, 2002 to be removed from the non-compete clause contained in the Employment Agreement. Mr. John Williams testified that Pastrick did not provide any information regarding his intentions to terminate his employment prior to PSA's receipt of the lawsuit. After PSA's receipt of the notice of the lawsuit, Pastrick's attorney informed PSA that Pastrick intended to open his own practice. Pastrick then informed Mr. Williams that he was going to leave the practice, but he did not know when. Because Pastrick was the only physician in the practice, PSA had no choice but to close the practice on October 11, 2002. The Court further finds that had Pastrick been allowed to continue his employment and the practice not close, that he had no incentive to assist in any effort to

- 14 -

maintain a successful, ongoing business as that would be in direct competition with the new practice that he intended to open in the near future since PSA had voluntarily released him from the non-compete clause in their Employment Agreement.

* * *

9.   During the buy-in negotiations, PSA began to pay and treat Patrick like an owner of the practice at his request.  PSA invited Pastrick to attend the partners' meetings and have a voice.  Pastrick attended the January 2002 meeting.  Also, as of December 1, 2001, PSA began to pay Pastrick as though he owned an interest in the practice.  Because Pastrick was being treated as an owner, he received a 10% bonus.

10.   The final calculation for the determination of income provided in Paragraph 8.2 is calculated on an annual basis.  In order to have income throughout the year on a month-to-month basis in accordance with industry standards, PSA and Pastrick agreed that Pastrick would be advanced money against the receipts of the company, in the amount of 30% of net[3] receipts collected each month.  At the end of the fiscal year, the 30% of monthly receipts would be measured against 80% of annual net profits and any necessary adjustments would be made.   The parties never deviated from the calculation set forth in Paragraph 8.2.  Rather, the 30% of net receipts calculation was simply a method to establish a monthly salary for Pastrick.  PSA began paying Pastrick at the rate of 30% of collections on January 1, 2002.[4]

11.   The parties entered into a Buy-In Agreement dated July 15, 2002.

12.   On October 11, 2002, the practice closed.  Although PSA had not transferred any interest in the company to Pastrick at that time, the parties had an implied contract based on their acts and conduct. . . .

---

[3]Gross.
[4]December 1, 2001.

13. Pastrick drew the sum of $183,881.00 as an advance against income earned from December 1, 2001 through October 11, 2002. Paula Smith, financial manager and certified public accountant for PSA, testified that applying the formula for compensation set forth in paragraph 8.2 of the contract, Pastrick drew $246,633.00 over and above his entitled compensation.

\* \* \*

15. The Employment Agreement does not clearly specify how "net profits" are to be calculated. The Court finds that the term "net profits" is ambiguous. . . . The Court finds that the term "net profits" in Paragraph 8.2 of the Employment Agreement is a latent ambiguity because the Employment Agreement does not clearly specify how "net profits" are to be calculated. As such, parol evidence is admissible to explain the term.

16. In Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996). The Court finds that Pastrick's failure to provide adequate notice of his intention to leave the practice and start his own practice violated the duty of good faith and fair dealing.

17. Pastrick denies that Paragraph 8.2 of the Employment Agreement has any applicability. According to him, the parties had agreed to a new method of compensation during the negotiations for his purchase of PSA's shares. In support of his argument, he relies on Paragraph 11 of the Employment Agreement, which provides as follows:

> 11. Modification of Payments. Company and Employee may from time to time by mutual agreement change any payments called for under any Paragraph of this Agreement.

18. Pastrick also alleges that even if paragraph 8.2 of the Employment Agreement controls, there is no provision for any refund or any reference to PSA's right to such. The Court finds that based on the permissible parol evidence of

the parties' course of dealing and the fact that Pastrick was being treated as an owner, this argument fails.

19. Pastrick alleges in his counterclaim that PSA grossly mismanaged the corporate business. He alleges that this mismanagement violated PSA's implied duty to him and deprived him of the opportunity to earn additional financial incentives under the Employment Agreement. However, the Court finds that Pastrick failed to offer any evidence of the alleged mismanagement of the business. Both Mr. Williams and Ms. Smith provided testimony at trial regarding their professional experience. Pastrick offered no testimony at trial alleging that Mr. Williams and Ms. Smith were not qualified to manage the operation and finances of the business. Mr. Williams and Ms. Smith also testified that Pastrick was never denied access to documentation regarding the business. In fact, Pastrick received a monthly report regarding the financial status of the company. Mr. Williams testified that at no point in the employment negotiations did Pastrick voice any concerns regarding the corporate structure or investments made to create the practice.

20. Pastrick also contends that PSA breached its obligation to him to compensate him for services performed during September and October 2002. However, according to the terms of Paragraph 8.2 of the Employment Agreement, Pastrick was overcompensated by PSA.

21. There being no set-off proven by Pastrick, the Court finds, based on the testimony of Paula Smith, that he was overpaid by $246,633.00. There was a book profit of $130,655.00 as of the closing date of the business. There was a closeout loss of $200,380.00 which represents the uncollected receipts less unpaid expenses. This resulted in a net profit (loss) of $69,725.00. Because the parties agreed that Pastrick would be treated as an owner and because he was treated as such, he is responsible for his share of the outstanding debt. Pursuant to the Employment Agreement, Pastrick was compensated in the amount of 80% of the net profits. Pastrick also received a 10% bonus. His 90% of the net profits (loss) of $62,752. Because Pastrick received $183,881.00 in compensation, he was overcompensated by $246,633.00.

22. PSA is not entitled to prejudgment interest as a matter of equity due to its inexcusable delay for over ten years in setting this case for trial.

(Citations omitted) (numbering in original). This timely appeal followed.


## II. ISSUES

The issues raised in this appeal by Dr. Pastrick are restated as follows:

1. Whether the trial court erred in permitting PSA to sue to enforce an illegal agreement, where PSA was a general purpose corporation, owned in part by a non-physician, and cannot legally provide medical or surgical services or require a physician to split his professional fees.

2. Whether the trial court erred in holding that Dr. Pastrick violated his duty of good faith and fair dealing by failing to give 180 days' notice of intent to terminate his employment, where PSA unilaterally terminated Dr. Pastrick after he announced his intent to leave the practice "at some point."

3. Whether the trial court erred in holding that Dr. Pastrick's agreed salary was less than 30% of PSA's gross receipts.

4. Alternatively, whether the trial court erred by calculating Dr. Pastrick's pay under Section 8.2 of the Agreement.

5. Whether the trial court erred by holding Dr. Pastrick responsible for a share of PSA's accrued debt, where Dr. Pastrick was an employee, and not an owner or shareholder.


## III. STANDARD OF REVIEW

In a civil case heard without a jury, the trial court's findings of fact are presumed to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Hughes v. Metro. Gov't. of Nashville and Davidson Cnty.,* 340 S.W.3d 352 (Tenn. 2011). In order for the evidence to preponderate against a trial court's findings, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath Assocs.,*

40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn,* 270 S.W.3d 42, 47 (Tenn. 2008).   The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *Morrison v. Allen,* 33 8 S. W.35 417, 426 (Tenn. 2011).

In this case, it is necessary to construe the Agreement and the statutory provisions. As noted in *Cookeville Regional Medical Center Authority v. Cardiac Anesthesia Services, PLLC*, No. M2007-02561-COA-R3-CV, 2009 WL 4113586 (Tenn. Ct. App. Nov. 24, 2009),

> [t]he applicable standards of review and rules of construction are strikingly similar since it is the court's goal to ascertain the intent of the parties to the contract and to ascertain the intent of the legislature in the statute.   The process of ascertaining intent, in both situations, begins with the language actually used.
>
> A.  Contract Construction
>
> The question of interpretation of a contract is a question of law.  *Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal.  *Allstate Insurance Company v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Angus v. Western Heritage Ins. Co.,* 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000).  This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).
>
> Our review is governed by well-settled principles.   "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern."  *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.,* 78 S.W.3d 885, 890 (Tenn. 2002).  The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used.  *Allstate Ins. Co.,* 195 S.W.3d at 611; *Staubach Retail*

*Services-Southeast LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005); *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.,* 521 S.W.2d 578, 580 (Tenn. 1975).

In construing the contract, the court is to determine whether the language is ambiguous. *Allstate Ins. Co.,* 195 S.W.3d at 611; *Planters Gin Co.*, 78 S.W.3d at 890. If the language in the contract is clear and unambiguous, then the "literal meaning controls the outcome of the dispute." *Allstate Ins. Co.*, 195 S.W.3d at 611; *City of Cookeville, TN v. Cookeville Regional Med. Ctr.,* 126 S.W.3d 897, 903 (Tenn. 2004); *Planters Gin Co.*, 78 S.W.3d at 890. "A contract term is not ambiguous merely because the parties to the contract may interpret the term in different ways." *Staubach*, 160 S.W.3d at 526.

B. Statutory Construction

Construction of a statute is also a question of law which appellate courts review de novo, without a presumption of correctness of the trial court's findings. *Barge v. Sadler*, 70 S.W.3d 683, 686 (Tenn. 2002); *Hill v. City of Germantown*, 31 S.W3d 234, 237 (Tenn. 2000); *Gleaves v. Checker Cab Transit Corp.,* Inc., 15 S.W.3d 799, 802 (Tenn. 2000); *Exxonmobil Oil Corp. v. Metro. Gov't. of Nashville and Davidson County*, 246 S.W.3d 31, 35 (Tenn. Ct. App. 2005).

The primary rule of statutory construction is "to ascertain and give effect to the intention and purpose of the legislature." *LensCrafters, Inc. v. Sundquist*, 33 S.W.3d 772, 777 (Tenn. 2000); *Carson Creek Vacation Resorts, Inc. v. Dept. of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993); *Exxonmobil*, 246 S.W.3d at 35; *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002). To determine legislative intent or purpose, one must look to the natural and ordinary meaning of the language used in the statute itself. We must examine any provision within the context of the entire statute and in light of its over-arching purpose and the goals it serves. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Cohen v. Cohen*, 937 S.W.2d 823, 828 (Tenn. 1996); *Exxonmobil*, 246 S.W.3d at 35; *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 867 (Tenn. Ct. App. 2002).

- 20 -

The statute should be read "without any forced or subtle construction which would extend or limit its meaning." *Nat'l Gas Distributors, Inc. v. State,* 804 S.W.2d 66, 67 (Tenn. 1991). As our Supreme Court has said, "[w]e must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning." *Scott v. Ashland Healthcare Center, Inc.*, 49 S.W.3d 281, 286 (Tenn. 2001) (citing *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995)).

Courts are also instructed to "give effect to every word, phrase, clause and sentence of the act in order to carry out the legislative intent." *Tidwell v. Collins*, 522 S.W.2d 674, 676-77 (Tenn. 1975); *In re Estate of Dobbins*, 987 S.W.2d 30, 34 (Tenn. Ct. App. 1998). Courts must presume that the General Assembly selected these words deliberately, *Tenn. Manufactured Housing Ass'n. v. Metro. Gov't.*, 798 S.W.2d 254, 257 (Tenn. Ct. App. 1990), and that the use of these words conveys some intent and carries meaning and purpose. *Tennessee Growers, Inc. v. King*, 682 S.W.2d 203, 205 (Tenn. 1984); *Clark v. Crow*, 37 S.W.3d 919, 922 (Tenn. Ct. App. 2000).

When construing statutes that are part of a statutory scheme, we are also directed to look to the context of the particular provision. Our Supreme Court has made the following observation:

When statutory provisions are, as in this case, enacted as part of a larger Act, 'we examine the entire Act with a view to arrive at the true intention of each section and the effect to be given, if possible, to the entire Act and every section thereof. Where different sections are apparently in conflict we must harmonize them, if practicable, and lean in favor of a construction which will render every word operative.'

*Hill*, 31 S.W.3d at 238 (quoting *Bible & Godwin Constr. Co. v. Faener Corp.*, 504 S.W.2d 370, 371 (Tenn. 1974)).

*Cookeville Reg'l.*, 2009 WL 4113586 at *2-4.

# IV. DISCUSSION

Dr. Pastrick argues that the Agreement between the parties is an illegal contract because PSA, as a for-profit general corporation, cannot provide medical services pursuant to Tennessee Code Annotated section 68-11-205. Dr. Pastrick also argues that the Agreement provides for the splitting of fees between a physician and a non-physician investor and a management group including the non-physician in violation of Tennessee Code Annotated section 63-6-225.

In the opening arguments at trial, counsel for PSA noted as follows:

[O]ne of the issues that you'll have to consider that we contend is a red herring is . . . that when this practice was put together Mr. John Williams . . . who's the representative of Plastic Surgery Associates, is a non-doctor. He, he was given a share in the practice of Plastic Surgery Associates by way of a management company that also owned the interest. . . . Mr. Adkins has argued . . . we have an illegal contract because a doctor cannot share his fees and cannot be a co-owner with a non-doctor. I think the case law is clear and the statute is clear that the issuance of shares to . . . Mr. Williams, if inappropriate or if illegal in the sense that he's not allowed to have shared is the case, then that just means he doesn't get any shares. It doesn't void the corporation itself. . . . When Dr. Pastrick at the end of his contract, after signing everything says, well, gee, it's illegal because we have a , a . . . non-doctor involved in this, two things occurred. . . . [T]hey check, but more importantly they agreed with Dr. Pastrick. If that's a problem Mr. Williams is out. . . . [T]he Mr. Williams could not get a share. It didn't end the corporation. It just meant Mr. Williams could not own anything. Nobody went to the medical board. Nobody did anything. Dr. Pastrick didn't lose a dime. Mr. Williams was not over-reaching. It's nothing more than a red herring. . . .

Tennessee Code Annotated section 68-11-205 addresses the unauthorized practice of medicine. As noted in an August 8, 2007 Tennessee Attorney General opinion:

The legal principle that undergirds . . . [Tennessee Code Annotated section] 68-11-205 . . . . is a common law legal doctrine known as the "corporate practice of medicine" doctrine. The Tennessee Supreme Court invoked the principles of this doctrine in *State ex rel. Loser v. National Optical Stores Co*., 189 Tenn. 433, 225 S.W.2d 263 (Tenn. 1949), when it held that the "rule is uniform that a

corporation cannot practice one of the learned professions." Relying on decisions from other jurisdictions that reached a similar result, the court in *Loser* reasoned that if that course were sanctioned, the logical result would be that corporations and business partnerships "might practice law, medicine, dentistry or any other profession by the simple expedient of employing licensed agents," and that if this were permitted, "professional standards would be practically destroyed, and professions requiring special training would be commercialized, to the public detriment." The court in *Loser* pointed out further that the "ethics of any profession is based upon personal or individual responsibility," and that one who practices a profession "is responsible directly to his patient or his client," and hence "he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character." *Id.* at 445, 446 (citations omitted).

. . . [B]oth Tenn. Code Ann. §§ 48-101-610(d) and 48-249-1109(e) provide that certain specified combinations of health care professionals have a right to own stock in, or be members or holders of financial rights in, the same professional corporation or PLLC. The legislature has determined that the services rendered by these health care professionals are "related and complementary to each other." Tenn. Code Ann. §§ 48-101-610(d)(4) and 48-249-1109(e)(2). . . .

\* \* \*

. . . [B]oth Tenn. Code Ann. §§ 48-101-610(a)(2) and 48-249-1109(b), respectively, impose certain limitations on ownership and eligibility. The former section prohibits a professional corporation from issuing shares for sale to persons who are not licensed to practice such profession in Tennessee, unless the licensing authority that licenses the professionals forming such corporations specifically authorizes the issuance of such shares. The latter section prohibits a PLLC from having persons who are not licensed to practice a profession described in the PLLC's articles in this state as members or holders of financial rights, unless the licensing authority that licenses the professions who are

members or holders of such a PLLC specifically so authorizes. *Id. . . . .*

\* \* \*

. . . [I]t is not lawful for a licensed physician to be employed by a non-physician, unless such employment falls within a specific statutory exception to the "corporate practice of medicine" doctrine. . . .

Tenn. Op. Atty. Gen. No. 07-116, 2007 WL 2819326 (Tenn. A.G. Aug. 8, 2007), at \*2-5. A prior Attorney General opinion in 1994 concluded "that the common law as expressed in the *Loser* case would bar the employment of a licensed physician as a salaried employee by a business corporation . . . ." Tenn. Op. Atty. Gen. No. 94-009, 1994 WL 30499 (Tenn. A.G. Jan. 28, 1994) at \*3.

PSA, owned by a general LLC (SMS) that includes a non-physician, was incorporated as a general for-profit corporation. A general corporation, as opposed to a professional corporation, does not have the legal capacity to practice medicine in the State of Tennessee. *See* Tenn. Op. Atty. Gen. No. 88-152, 1988 WL 410228 (Tenn. A.G. Aug. 25, 1988) at \*3. It would appear that the provision of professional plastic surgery services by a licensed physician acting on the behalf of PSA as a general corporation constituted a violation of Tennessee Code Annotated section 63-6-201, et seq. "[B]ased upon the existing Tennessee statutes and common law principles, a nonprofessional corporation cannot lawfully engage in the practice of medicine; nor can it employ physicians to practice for it." Tenn. Op. Atty. Gen. No. 94-053, 1994 WL 133678 (Tenn. A.G. Apr. 12, 1994) at \*2.

Tennessee Code Annotated section 63-6-225 provides as follows:

(a) It is an offense for any licensed physician or surgeon to divide or to agree to divide any fee or compensation of any sort received or charged in the practice of medicine or surgery with any person, without the knowledge and consent of the person paying the fee or compensation, or against whom the fee may be charged.

(b) The provisions of this section do not prohibit a physician from compensating any independent contractor that provides goods or services to the physician on the basis of a percentage of the physician's fees generated in the practice of medicine. The percentage must be reasonably related to the value of the

goods or services provided.  Payments by physicians in return
for referrals are prohibited.

(c)  A violation of this section is a Class B misdemeanor.

Tennessee Code Annotated section 63-6-226 authorizes a treble damage recovery for violation of the fee splitting prohibition of Tennessee Code Annotated section 63-6-225.

In a 2009 opinion, *Cookeville Regional Medical Center Authority v. Cardiac Anesthesia Services, PLLC*, No. M2007-02561-COA-R3-CV, 2009 WL 4113586 (Tenn. Ct. App. Nov. 24, 2009) (cert. denied May 20, 2010), a panel of this court concluded that the determinative issue on appeal in that fee splitting case was whether the contract between the hospital and a physician group contained an unlawful division of fees prohibited by Tennessee Code Annotated section 63-6-225 and was, thus, unenforceable. Five years into the contract, both parties had charged breach of contract.  This court held:

> Tenn. Code Ann. § 63-6-225(a) is quite clear.  Under subsection (a), a licensed physician may not divide his or her fee or even agree to divide a fee with any person.  The statute contains only two exceptions to this prohibition.  First, subsection (a) provides that a physician may split the fee with another if there is consent by the patient or payor.  In other words, so long as all parties to the transaction agree, then subsection (a) does not prohibit fee splitting.  Second, under subsection (b) a fee may be split to pay for goods or services if the amount is reasonably related to the value of those goods or services.  It is clear neither exception applies here.

*Id.* at *5.  The court in *Cookeville Regional* concluded that "[i]f a contract is prohibited by statute, then it cannot be enforced."  *Id.* at *6 (citing *Mascari v. Raines*, 415 S.W.2d 874, 876 (Tenn. 1967); *Kirkpatrick v. Tipton*, 670 S.W.2d 224, 226 n. 4 (Tenn. Ct. App. 1984)).  The court further provided:  "[t]o hold that the fee-splitting statute does not apply to [a] physician group . . . would, in essence, rob the statute of its effectiveness in preventing the evils the legislature sought to avoid."  *Id.*  In a related case, *Cardiac Anesthesia Services, PLLC v. Jones*, 385 S.W.3d 530 (Tenn. Ct. App. 2012) (cert. denied Aug. 16, 2012), another panel observed that "Tennessee law provides that a physician may not agree to divide any fee received without the knowledge and consent of the individual paying the fee."  *Id.* at 532.  An earlier opinion by the Tennessee Attorney General observed that despite "concerns that certain widespread, and now widely-accepted, physician practices would be prohibited" if the statute is enforced, "[n]either the plain language of T.C.A. § 63-6-225, its legislative history, nor case law supports the conclusion that the General Assembly intended to limit the application of this statute solely to situations involving a physician's division of a fee with someone who makes a

referral." Tenn. Op. Atty. Gen. No. 95-030, 1995 WL 173796 (Tenn. A.G. Apr. 5, 1995) at *3. Under the ordinary language of Tennessee Code Annotated section 63-6-225, the Agreement before us to split fees is prohibited by the statute.

PSA submits that this case is controlled by *Medical Education Assistance Corporation v. State,* 19 S.W.3d 803 (Tenn. Ct. App. 1999). In that case, Dr. Mehta argued that at the time that he entered into his employment contract with East Tennessee State University and the Medical Education Assistance Corporation, Tennessee Code Annotated sections 63-6-204 and 68-11-205 provided that "a corporation and any state, local, county governmental unit or division thereof were prohibited from the practice of medicine and physicians were not permitted to divide or split their fees with nonphysicians." *Medical Educ.,* 19 S.W.3d at 812. This court determined that Dr. Mehta was estopped from asserting his defense to the enforcement of the employment contract because Dr. Mehta's positive acts of practicing medicine and his silence or negative omission to make any objection over the course of ten years inured to his great benefit in that his employer provided an initial referral network, office space, equipment, and staff. *Id.* The *Medical Education* court went on to hold that even without the ten-year lapse before Dr. Mehta raised his objections regarding the legality of the employment contract, his arguments would still fail because Dr. Mehta was not a member of the class sought to be protected by the statute. Rather, he sought enforcement of the rule for more personal reasons. *Id. at* 813.

In *Newton v. Cox*, 878 S.W.2d 105 (Tenn. 1994), our Supreme Court directed us that when we conclude statutes under consideration "represent[] a declaration of the public policy of this State, we must next determine whether a contract in contravention of [those] statute[s] is 'void' or 'voidable.'" *Id.* at 108. The *Newton* Court observed:

> It is widely recognized that
>
> [a] void contract is no contract at all; it binds no one and is a mere nullity. Accordingly, an action cannot be maintained for damages for its breach. No disaffirmance is required to avoid it, and it cannot be validated by ratification. . . . A contract wholly void is void as to everybody whose rights would be affected by it if valid.
>
> 17A Am.Jur.2d *Contracts* § 7 (1991) (footnotes omitted).
>
> In contrast,
>
> A voidable contract is one where one or more parties have the power . . . to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of

avoidance. Accordingly, a voidable contract is valid and binding until it is avoided by the party entitled to avoid it.

*Id.*

The prevailing view which has also been applied in Tennessee is that contracts are voidable and not void when they violate statutes enacted for the protection of the public interests or for the protection of the class of persons of which the party seeking to avoid the contract is a member. *Herbert v. W.G. Bush & Co.,* 42 Tenn. App. 1, 298 S.W.2d 747, 752 (1956); *Palmer Bros. v. Havens*, 29 Tenn. App. 8, 193 S.W.2d 91, 92 (1945); *see generally* 17A Am.Jur.2d *Contracts* § 251 (1991).

The Agreement in this case allowed an unlicensed general corporation owned in part by a non-physician to be compensated through a percentage of the net profits generated by the licensed physician. As noted above, "a nonprofessional corporation cannot lawfully engage in the practice of medicine; nor can it employ physicians to practice for it." Tenn. Op. Atty. Gen. No. 94-053, 1994 WL 133678 (Tenn. A.G. Apr. 12, 1994) at *2.

As described in *Newton*, the Agreement before us violates statutes enacted both for the protection of the public and for the protection of "the party seeking to avoid the contract," i.e., the licensed physician, Dr. Pastrick. 878 S.W.2d at 108. Since the Agreement entered into between Dr. Pastrick and PSA violates the statutes and the public policy of this state, we find that it was voidable. *Id.* at 108, 112. As a "voidable" contract, it was "valid and binding" until it was "avoided by the party entitled to avoid it" or **"ratifi[ed] . . . to extinguish the power of avoidance."** *Id.* at 108 (emphasis added). A preponderance of the evidence in this case supports the conclusion of the trial court that Dr. Pastrick, by his actions, ratified the Agreement. He is estopped to now seek to avoid it.

## V. CONCLUSION

We therefore conclude that the trial court did not err in allowing enforcement of the Agreement. The evidence likewise does not preponderate against the trial court's determination that Dr. Pastrick violated his duty of good faith and fair dealing by failing to give 180 days' notice in writing of his desire to terminate his employment, which his ability to open a new private practice in the same month PSA closed reveals had long been his intent. The record additionally reveals that Dr. Pastrick was considered and treated as an owner of the practice, as he made his own scheduling times at the facility, hosted a Christmas party at his home that was billed to the company, and attended at least

one board meeting in addition to receiving the increased monthly salary. Accordingly, the evidence supports the trial court's calculation of Dr. Pastrick's pay and responsibility for the share of the accrued debt.

The trial court's decision is affirmed and the case remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Gregory H. Pastrick.

_____
JOHN W. McCLARTY, JUDGE
