In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00368-CV
_____

TUBAL CAIN INDUSTRIES, INC., Appellant

V.

J.W. GARRETT & SON, INC. D/B/A G&G ENTERPRISES
CONSTRUCTION CORPORATION, Appellee

On Appeal from the 172nd District Court
Jefferson County, Texas
Trial Cause No. E-209,041

## MEMORANDUM OPINION

Appellee J.W. Garrett & Son, Inc. d/b/a G&G Enterprises Construction Corporation ("G&G" or "Appellee") sued Tubal Cain Industries, Inc. ("Tubal" or "Appellant") for breach of contract. G&G based its claim on Tubal's handling of its successful bid to construct a transportation facility for the West Orange Cove Consolidated Independent School District ("ISD"). The case was tried to a jury, which returned a verdict in G&G's favor as to liability, damages, and attorney's fees.

1

The trial court entered a judgment for $206,636, plus interest and attorney's fees, based on the jury's verdict. After Tubal's Motion for New Trial was overruled by operation of law, Tubal appealed the trial court's judgment, arguing that "there was legally insufficient evidence as to the reasonableness of the amount [G&G] spent 'out-of-pocket' to complete the project." Tubal contends that since G&G is not entitled to recover damages, it is not entitled to recover its attorney's fees.

We affirm the trial court's judgment.

## BACKGROUND

ISD constructed several buildings financed through a bond package worth twenty-four million dollars. G&G, the general contractor, awarded Tubal the bid to construct ISD's transportation facility. The January 29, 2021 contract between G&G and Tubal called for Tubal "to provide all necessary labor and services to supply one 100' wide x 226' long 'Butler' brand pre-engineered metal building to serve as a Transportation Facility for the West Orange-Cove CISD." The contract further specified such matters as the type of framing materials, the type of coating, and the wind speed rating. The original contract price listed is $291,450, but this figure was later revised to $290,236.50.

Tubal then contracted with Butler to provide the building, with a planned delivery date of October 22, 2021. When delays extended Butler's delivery time to February 2022, Tubal decided to manufacture the building instead of buying it from

2

Butler, but rising steel costs precluded Tubal from doing so at the original contract price. Tubal therefore requested G&G to approve a change order for $206,636 to account for this cost increase, but G&G declined to approve the change order. G&G eventually contracted with Alliance Steel Building Systems ("Alliance") to complete the building at a cost of $255,660 and sued Tubal to recover damages and attorney's fees. We summarize the evidence below.

G&G Witnesses

Ashley Hillsten's Testimony

Ashley Hillsten ("Hillsten") testified that she was G&G's Senior Quality Manager, a position she described as being the liaison between the subcontractor and the architect. In this position, Hillsten was responsible for ensuring "that everything [that] is coming into the project, conforms to the plans and specs of the job."

Hillsten discussed schedules, noting that it was necessary to coordinate all the subcontractors "from the ground up." She indicated that it would take two to three weeks for the architect to approve the drawings, but there were delays due to Tubal "not following the procedures of Butler." Hillsten considered Tubal at fault for the schedule delays and design and planning errors. Eventually, according to Hillsten, Tubal abandoned the project. In December 2021, G&G contracted with Alliance. Hillsten recalled that Alliance provided the materials in early March 2022.

<u>Steven Weldon's Testimony</u>

Steven Weldon ("Weldon"), a project manager with G&G, testified that he oversaw all of the ISD's bond projects. Although Weldon was not involved with the contract negotiations between G&G and its subcontractors, he testified that it was Tubal, not G&G, that chose Butler as the brand of metal building it would supply. Tubal could have used Butler, Mueller, or Alliance to provide the metal building, so long as the building complied with the plans and specifications. Weldon also testified that it was Tubal that supplied the schedule it received from Butler. Although "[i]t is common[]" to revise schedule dates, Weldon stated that Tubal did not come close to meeting the schedule. In particular, Weldon testified that G&G did not receive shop drawings by the scheduled date of March 30 and had yet to provide those plans by May 11. Weldon later acknowledged, however, that the late drawings would have been Butler's work—not Tubal's. Weldon further acknowledged having threatened to cancel the contract "for just cause" and having intended that Tubal take that threat seriously, despite Weldon lacking the authority to do so. G&G later retained other contractors, including Alliance Steel and Boren Construction, to complete the project.

<u>Colin Garrett's Testimony</u>

Colin Garrett ("Garrett") is the president and COO of G&G, a commercial and industrial general contractor. Garrett described G&G's business as building

4

buildings, roads, fencing, and infrastructure items necessary to support building services. In 2018, the ISD chose G&G as the construction manager for the approximately nine projects in its bond program, and in 2021, G&G accepted Tubal's bid to supply the pre-engineered metal building for the transportation center. After Garrett and Baker clarified whether certain building components were or were not included in Tubal's bid, Tubal and G&G agreed on a price of $291,450.

Baker then contacted Butler for a price, but when Tubal learned that "somewhere in the bidding process[,]" Tubal "had missed a lot of items[,]" Tubal requested a price increase of $44,000 and advised Garrett that the metal soffit would cost $1,700. Garrett responded by reminding Tubal "that the price they gave is a fixed price that I gave to the district and I am now at risk for it and the fact that mistakes were made on their bid can't be [foisted] on me because my price is already set with the school district." Baker then negotiated further with Butler and G&G, eventually agreeing to reduce Tubal's profit. G&G then agreed to absorb $11,000 of the cost increase, and the project proceeded.

When asked about Weldon's threat to cancel the contract, Garrett confirmed that Tubal "missed every single deadline that they gave to us[,]" they never provided G&G a complete set of drawings, and did not provide all the necessary structural steel, but Weldon lacked the power to cancel G&G's purchase order. Garrett further stated that he was not considering cancelling the contract at that time, although he

5

had testified otherwise during his deposition. When asked whether it was reasonable for Tubal to have believed Weldon's threat, Garrett responded that he would not have believed it if he were in Tubal's position.

G&G eventually retained Alliance to complete the project, at a cost of $255,660. G&G chose to pay Alliance more than Tubal sought because, in Garrett's words, "Tubal Cain, at that time of this contract and their performance, indicated that they had no idea what they were doing with respect to pre-engineered metal buildings."

Garrett testified to the individual cost items in its Exhibit 32, an itemized chart of its alleged out-of-pocket expenses and damages other than interest and attorney's fees. In particular, Garrett identified: (1) base angle and channels for the window frames, purchased from Meuller; (2) galvanized components; (3) Boren Construction's $3,850 charge to remove and replace the eve strut with one of the correct size; (4) Boren Construction's $10,530 charge to supply missing items; (5) remobilization charges of $2,800 paid to other contractors due to "the time difference between when the structural steel secondary members showed up versus when the cladding showed up;" (6) $20,797.90 for insulation; (7) an overpayment due to a billing error; (8) additional rental cost for dumpsters and portable toilets due to the delay; (9) additional time Weldon and Hillsten spent preparing for trial; and

6

(10) the cost of the builder's risk policy to cover "catastrophic" events during the project delay.

Randall Cashiola's Testimony

Randall Cashiola ("Cashiola") testified for G&G as an expert in attorney's fees. After outlining his educational qualifications and experience as a practicing attorney, Cashiola testified that he had reviewed G&G's pleadings and billing records. Cashiola considered the following criteria involved in determining a reasonable fee (1) the time and labor involved in the case, (2) the novelty and difficulty of the questions involved in the case, (3) the fee customarily charged in the locality for similar legal services, (4) the amount of money involved and the results obtained for the client, (5) time limitations imposed by the client or the circumstances, (6) the nature and length of the attorney/client relationship, and (7) the attorney's experience. According to Cashiola, the fee G&G paid its attorneys was reasonable and necessary considering these factors. Specifically, Cashiola testified that $275 was a reasonable hourly rate for one attorney, $350 was a reasonable hourly rate for the other attorney, and that $110 was a reasonable hourly rate for paralegal services. Cashiola considered G&G's total fee through the time of trial, $89,609.69, reasonable and necessary, and further opined that fees of $30,000 and $25,000 would be reasonable and necessary for appeals to the Ninth Court of Appeals and to the Texas Supreme Court, respectively.

Tubal Cain Witnesses

Tony Baker's Testimony

Tony Baker ("Baker") had worked for Tubal during this time. He recalled that he worked as an estimator/project manager from 2017 to February 1, 2021. Baker described his duties in these positions as "estimating on various types of construction projects[,]" including "a lot of steel construction." He also "would go to the field from time to time to oversee construction activities, monitor safety," and deal with clients. Baker believed that while he worked at Tubal, he was involved in bidding on about one hundred metal buildings, eight to ten of which were awarded to Tubal. In the case of the ISD building, Tubal made two bids because some items were omitted from the initial bid. Tubal's bid on the ISD transportation building was a "lump sum" bid, meaning that it was intended to cover the entire cost of the project.

Baker described the usual bid process with Butler as beginning with entering the customer's specifications into Butler's computer program to create a model of the building. Baker would then send the model to Butler for pricing and delivery time after which he would send Butler a purchase order. Baker testified that he followed this same procedure in this case and recalled that he placed the order with Butler in time to avoid an imminent price increase.

If Tubal were fabricating a metal building, Baker would have ensured the materials were ordered and drawings were in place. "[F]rom there, it's going to the

shop as far as the fabrication of it." Baker considered Tubal qualified to fabricate a metal building in its own facility and stated that Tubal had done so two or three times.

Lonnie Williamson's Testimony

Lonnie Williamson ("Williamson"), Tubal's vice president and manager, testified that he was the lead person on G&G's contract after Baker left Tubal. By the time Williamson became involved, Tubal and G&G had signed their contract.

Williamson confirmed that Tubal bid the project at a fixed price and that the contract between Tubal and G&G dictated that time was of the essence, although G&G's contract with ISD did not dictate that time was of the essence.

Williamson testified about the reasons for the project delays. Specifically, he stated that there was a software compatibility problem, which was quickly resolved, a personnel shortage due to the Covid pandemic, supply issues, and that the project had to be rebid because of erroneous entries Baker made in Butler's program. In addition, the first and second sets of shop drawings were incomplete, and Tubal never did the cladding drawings. Williamson also recalled that it was difficult to contact MBCI[1] to obtain the color samples. For that reason, Williamson visited

---

[1] MBCI stands for Metal Building Components, Inc. It is a subsidiary of Cornerstone Building Brands, and it was necessary to use MBCI's samples to determine the color of the cladding.

MBCI when he was in Houston in late August, retrieved the color samples, and ensured that they were delivered to Hillsten.

Williamson confirmed that Tubal sought additional money to complete the project, but that the ISD's architect declined this request. He further confirmed that he believed the threat Weldon emailed in which Weldon threatened to cancel the contract.

When asked about Tubal's price increase, Williamson testified that Tubal was seeking $206,000 for the cladding, in addition to the approximately $100,000 that remained payable under the contract. If G&G had agreed to the change order, this agreement would have revised the project total for Tubal from $308,304 to $514,940, an increase of approximately 70%. Williamson sent an email to Colin Garrett that explained the market conditions, writing how prices for materials were changing due to "massive spikes in raw material costs, including the COVID-19 pandemic, massive labor shortages and worldwide supply chain issues, mak[ing] it commercially impracticable and therefore unfeasibly costly for Tubal-Cain to perform under the original terms of the Contract."

Williamson also communicated by email with the project manager, Steve Weldon, explaining that "[t]he price of steel has dramatically increased since January 1, 2021 to now. We have seen a 75% increase during this time frame and 100% price increase from November 2020. You can go to any steel supplier in

10

America and they will tell you the same thing." In a related email to Weldon, Williamson explained that "I know G&G and every other person involved in the building industry including our clients are fully aware of the constant price increases we receive and to this day, I have vendors telling me that the steel prices are only good for 24 hours."

Timothy Van Huis' Testimony

Timothy Van Huis ("Van Huis"), Tubal's Vice-President of Operations, described his professional responsibilities as including "[j]ob cost reports with project managers[,]" working with Tubal's insurance, and "do[ing] anchor bolt estimates." Van Huis acknowledged he signed the G&G contract on Tubal's behalf and was unable to deliver the Butler brand metal building the contract specified. Van Huis likewise agreed that despite Tubal's efforts, it did not deliver the cladding to the building, but did deliver the structural steel. He also confirmed having provided G&G with the project schedule Tubal received from Butler and conceded that the project had to be rebid due to Baker's errors in seeking the original bid. Van Huis' testimony conflicted with Williamson's testimony when Van Huis claimed Tubal was really asking only for an additional $106,000 to complete the job. Van Huis admitted under cross examination that Tubal would also require payment of an additional $100,000 still due under the contract in order to complete the job without

11

including the insulation. Van Huis denied that Tubal declined to finish the project under any circumstances.

Other Witnesses

Robert Nathaniel Singley's Testimony

Robert Nathaniel Singley ("Singley"), Butler's Area Manager, testified about Butler's interaction with Tubal regarding the ISD building in 2021. Singley stated that the length of time for a building to get through the clarification and engineering process would depend on the building. A project like the ISD's transportation facility would take eight to ten weeks under "normal" circumstances, which Singley clarified as meaning without the supply-chain issues and personnel shortages during the Covid pandemic. The delays on this project were exacerbated by differences between the order and "what the project required." Singley also testified that it would have been within a normal range of time for the engineering drawings to be available two months after Butler received Tubal's purchase order and for an anticipated shipping date to be six months after the order was finalized.

Charles Green's Testimony

Charles Green ("Green"), MBCI's Director of Sales for its pre-engineered metal buildings division described MBCI's business as providing "the sheets, the trim, the secondary structural, the fasteners" for buildings that other companies have designed and framed. In 2021, Green was a general manager responsible for key

12

accounts and componentized buildings. He described his responsibilities in that position as "account management responsibility for the top ten MBCI accounts across the country."

To obtain a quote, a customer would call or email MBCI, specify the gauge, size, and color of the panels, as well as any associated trim, fasteners, and sealants, and ask for a price. MBCI personnel would then enter the customer's required materials into the computer to generate a price. Green conceded that given the Covid problems with personnel and supply chain, he would not be surprised if a color chip request took longer than usual. He also recalled that "2021 saw the most price increases and the most severe price increases in the history of us tracking price increases."

Documentary Evidence

The record contains the following:

- The contract between Tubal and G&G;

- The contract between ISD and G&G;

- Butler cost quotation and purchase order;

- MBCI cost quotation, showing a cost of $182,786.71;

- MBCI cost quotation, showing a cost of $175,515.67;

- Letters from MBCI regarding "unprecedented cost increases" and "material availability;"

13

- The invoice from Alliance Steel Building Systems, showing a cost of $255,660;

- G&G's itemized model of its damages, showing $236,701.19 (exclusive of interest and attorney's fees);

- Boren Construction's contract, invoices, and change orders for work on the eave strut and framing;

- Silvercote's invoice for insulation;

- Lien release;

- Muller Inc.'s invoice;

- Builders Risk Coverage Declarations;

- Receipt for galvanized building accessories;

- Excerpts from Tubal's website; and

- Emails discussing schedules, pricing, and project details.

The record also contains itemized statements of the attorney's fees incurred by both Tubal and G&G. G&G's counsel stipulated on the record that Tubal's attorney's fees of "$55,017.55 for trial preparation; $20,000 for [an] appeal to the Court of Appeals; and $15,000 for an appeal to the Supreme Court of Texas[]" were "reasonable and necessary."

### STANDARD OF REVIEW AND APPLICABLE LAW

We will sustain a legal sufficiency challenge only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) we are barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3)

14

the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We review the evidence in a light most favorable to the challenged finding, crediting any favorable evidence so long as a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821-22. We sustain legal sufficiency challenges "when among other things, the evidence offered to establish a vital fact does not exceed a scintilla." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

The Texas Supreme Court has discussed damages for the breach of a construction contract, stating that such damages may be measured by "the cost to complete or repair less the unpaid balance on the contract price[.]" *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012). *McGinty* cautions, however, that a party seeking such "remedial damages must prove that the damages sought are reasonable and necessary." *Id.* (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004)). Relying on its earlier opinion in *Mustang Pipeline*, the *McGinty* court further explained that a party seeking damages does not meet his burden by showing solely the amount paid but must show that the amount was

15

reasonable stating: "some other evidence is necessary." *Id.* Since the Texas Supreme Court has not overruled *McGinty*, a damage award based solely on the cost of repair or completion cannot be sustained absent some other evidence that the cost is reasonable. *Id.*

If evidence of reasonableness of the damage award is lacking, the attorney's fee award is likewise unsustainable, regardless of evidence that the amount sought is reasonable and necessary. *Mustang Pipeline Co.*, 134 S.W.3d at 201 (precluding attorney's fee award when no breach-of-contract damages are awarded); *Barragan v. Nederland Indep. Sch. Dist.*, No. 09-13-00350-CV, 2015 Tex. App. LEXIS 1103, at *11 (Tex. App.—Beaumont Feb. 5, 2015, pet. denied) (mem. op.) ("To recover attorney's fees under section 38.001, a party must both prevail on a breach of contract claim and recover damages."); *see* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8).

**ANALYSIS**

Tubal raises four issues on appeal. Issues One, Two, and Three address the legal sufficiency of the evidence supporting the reasonableness of the damage award and Issue Four addresses G&G's attorney's fees.

Issues One, Two, and Three: Legally Insufficient Evidence

In Tubal's first three appellate issues, it argues that since the record contains no evidence, also described as legally insufficient evidence, to prove that G&G's

16

alleged damages were reasonable, the trial court erred in the following particulars: (1) submitting a jury question asking "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate [G&G] for its damages, if any, that resulted from [Tubal's breach of contract;]" (2) overruling Tubal's Motion for Judgment Notwithstanding the Verdict, "because there is legally insufficient evidence as to the reasonableness of the amount [G&G] spent 'out-of-pocket' to complete the project[;]" and (3) awarding actual damages to G&G "because there is legally insufficient evidence as to the reasonableness of the amount [G&G] spent 'out-of-pocket' to complete the project."

As Tubal has correctly observed, the record does not include evidence explicitly stating that G&G's costs were reasonable. G&G argues, however, that express testimony as to the reasonableness of its claimed damages is not necessary to uphold the damage award. To support this position, G&G relies on several cases from our sister courts, which found that "[t]he absence of the word 'reasonable' is not fatal" to its damage claim.

For example, G&G relies on the rationale of *Hernandez v. Lautensack*, 201 S.W.3d 771, 777 (Tex. App.—Fort Worth 2006, pet. denied). The *Hernandez* court decided that the necessary evidence of reasonableness could be found in the defendant's own cost estimate. *Id.* G&G then applies this approach to Van Huis' testimony, contending that since Van Huis would have completed the project for an

17

additional $126,797.90, that figure is reasonable.[2] According to G&G, when Van Huis testified to being able to complete the project for an additional $126,797.90, in addition to payment of the $100,000 still owed on the contract, Van Huis judicially admitted that G&G's costs of completion were reasonable, and that Van Huis' testimony therefore supported the reasonableness of the jury's $217,000 damage finding. G&G contends that this constitutes "some other evidence" the Supreme Court referred to in *McGinty*. *See McGinty*, 372 S.W.3d at 627.

In addition, Tubal's vice president and manager, Williamson, testified that he had knowledge of market prices as to what was a reasonable amount needed to complete the job when he emailed Steve Weldon explaining the market conditions that prices for materials were changing due to "massive spikes in raw material costs, including the COVID-19 pandemic, massive labor shortages and worldwide supply chain issues, mak[ing] it commercially impracticable and therefore unfeasibly costly for Tubal-Cain to perform under the original terms of the Contract." Williamson further testified, "[w]e have seen a 75% increase during this time frame and 100% price increase from November 2020. You can go to any steel supplier in America and they will tell you the same thing." The jury awarded $217,000 in damages as the cost of completion of the metal building. This amount is very close to Van Huis'

---

[2] This amount is in addition to the $100,000 remaining unpaid under the contract.

request for an additional $226,797.90 to complete the project ($126,797.90 plus $100,000 still owed). This is some evidence admitted by Tubal which the jury may have considered regarding the reasonable cost of metal building construction at that time. The trial court reduced the final amount to $206,636.

On the other hand, Tubal asks us to follow the established precedent that evidence of amounts paid is not evidence that those amounts are reasonable. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 784 (Tex. 2020); *McGinty*, 372 S.W.3d at 627; *Leafguard of Tex. v. Guidry*, No. 09-21-00034-CV, 2023 Tex. App. LEXIS 3203, at *15 (Tex. App.—Beaumont, May 11, 2023, no pet.) (mem. op.). In fact, *McGinty* states that "the plaintiff must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.' Instead, some other 'evidence showing that the charges are reasonable' is required." 372 S.W.3d at 627 (citing *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). In remarking that "[n]either Hennen's damage expert nor any other witness testified to the reasonableness of the estimated cost[,]" G&G notes that here there was "other evidence," as referred to in *McGinty*, beyond the actual costs to complete the job, which was available for the jury to consider in this case. In *Hernandez*, the court of appeals found that there was other evidence before the jury that supported the verdict as to the reasonableness of the completion costs. *Hernandez*, 201 S.W.3d at 777. *See also Bernstein v. Thomas*, 298

19

S.W.3d 817, 826 (Tex. App.—Dallas 2009, no pet.); *2 Fat Guys Inv. v. Klaver*, 928 S.W.2d 268, 273 (Tex. App.—San Antonio 1996, no pet.). While the cases G&G cites preceded *McGinty*, since the *McGinty* case other appellate courts have found sufficient evidence consistent with the *McGinty* court's statement that in some cases the process of determining the repair costs can reveal factors that support the reasonableness of the ultimate price of completion. *See Shafaii Invs., Ltd. v. Bonilla*, No. 01-21-00731-CV, 2025 Tex. App. LEXIS 6948, at *29 (Tex. App.—Houston [1st Dist.] 2025, no pet.) ("But the Supreme Court has concluded that in some cases, the process of determining repair costs 'will reveal factors that were considered to ensure reasonableness of the ultimate price.'") (citing *McGinty*, 372 S.W.3d at 627). In *Shafaii*, the Bonilla parties suffered damages to their condominium units and each party testified about the process of obtaining multiple estimates for the repairs before they obtained their final contracts for the repairs. The *Shafaii* court stated, "Rivera and Angelino (the parties) did more than offer proof of just the cost of repairs they incurred; they each testified to the multiple estimates they received from various contractors, the process by which they selected a contractor, and how they determined the contractor's pricing, and thus, the cost of repairs under the circumstances, was reasonable." *Id.* A similar conclusion was reached in *Demiraj v. Martinez*, No. 01-23-00493-CV, 2025 Tex. App. LEXIS 1190, at *21 (Tex. App.—Houston [1st Dist.] Feb. 27, 2025, no pet.) *modified and supplemented by* No. 01-

23-00493-CV, 2025 Tex. App. LEXIS 1852 (Tex. App.—Houston [1st Dist.] Mar. 20, 2025) (mem. op.) (evidence that contractor charged amount consistent with multiple other contractors' estimates to complete repair job and that amount was in line with cost of work not completed by initial contractor was more than a scintilla of evidence to demonstrate amount paid was reasonable).

Similarly, in *Golden Corral v. Noble Austin Apartments LLC*, the "other evidence" the appellate court found was sufficient to support the verdict consisted of a combination of exhibits admitted and testimony explaining how the costs were determined. *See* No. 03-19-00463-CV, 2021 Tex. App. LEXIS 5465, at *34 (Tex. App.—Austin July 9, 2021, no pet.). The court stated:

> [a]lthough we agree with Golden Corral that "Ladera resorts to *indirect* evidence that it claims is sufficient to uphold the award," we conclude that the circumstantial evidence of Greystar's contractual obligations— when considered with Martin's and Therrien's trial testimony and Martin's documentation and invoices providing for electricity costs paid, contract work and services provided, equipment rented or purchased, and payroll and overtime pay to restore the Ladera Property that were admitted into evidence—constituted more than a scintilla of evidence that the documented costs for repairs were reasonable."

*Id.*

As in the foregoing cases, here there was "other evidence" before the jury to show the reasonableness of the costs for completion of the metal building. This evidence includes the testimony of Tubal's own witnesses and documents which, in combination with G&G's evidence, provides more than a scintilla of evidence

21

showing the reasonableness of the costs of completion. *Id.* We overrule Appellant's first, second and third issues.

Issue Four: G&G's Attorney's Fees

The Texas Civil Practice and Remedies Code permits reasonable attorney's fees to be recovered, "in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(b)(8). Case law dictates that to recover attorney's fees, a party "must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); *see also Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40-41 (Tex. 2012) (precluding attorney's fees in the absence of a damage award). In determining a reasonable fee, a court should consider evidence of the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill [required] to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Morrell Masonry Supply, Inc. v. Lupe's Shenandoah Reserve, LLC*, 363 S.W.3d 901, 909 (Tex. App.—Beaumont 2012, no pet.) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)).

Applying the above criteria, G&G presented Randall Cashiola as an expert in attorney' fees, which were submitted to the jury. After outlining his educational qualifications and experience as a practicing attorney, Cashiola testified that he had reviewed G&G's pleadings and billing records. Cashiola considered the following criteria involved in determining a reasonable fee (1) the time and labor involved in the case, (2) the novelty and difficulty of the questions involved in the case, (3) the fee customarily charged in the locality for similar legal services, (4) the amount of money involved and the results obtained for the client, (5) time limitations imposed by the client or the circumstances, (6) the nature and length of the attorney/client relationship, and (7) the attorney's experience. According to Cashiola, the fee G&G paid its attorneys was reasonable and necessary considering these factors. Specifically, Cashiola testified that $275 was a reasonable hourly rate for one attorney, $350 was a reasonable hourly rate for the other attorney, and that $110 was a reasonable hourly rate for paralegal services. Cashiola considered G&G's total fee through the time of trial, $89,609.69, reasonable and necessary, and further opined that fees of $30,000 and $25,000 would be reasonable and necessary for appeals to

23

the Ninth Court of Appeals and to the Texas Supreme Court, respectively. Tubal did not contradict this testimony. The jury adopted the attorney's fee amounts suggested by Cashiola through trial and appeal to the Court of Appeals and the Texas Supreme Court. The trial court, however, reduced the amount for appeal to the Texas Supreme Court to $15,000. Considering these figures, we cannot conclude that the trial court abused its discretion in awarding attorney's fees in the amounts set forth in the judgment. We overrule Appellant's fourth issue.

**CONCLUSION**

Having overruled all of Tubal's issues, we affirm the judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on August 28, 2025
Opinion Delivered December 4, 2025

Before Golemon, C.J., Johnson and Wright, JJ.